ROCKY MOUNTAIN FUEL COMPANY v. GEORGE N. SPARLING COAL COMPANY.

[No. 3956.]

1. EQUITABLE ESTOPPEL—*When Applied.* The rule that as between persons equally innocent, a loss resulting from the frauds of another shall rest upon him by whose act or omission the fraud has been made ·ose only operates to protect those who, in dealing with others exercise ordinary care and prudence; and as against those who have voluntarily conferred upon the perpetrator of the fraud the usual *indicia* of title, so that they have apparent authority to dispose of the property. The owner of goods is not to be affected by a sale by one having the mere manual possession of the goods, or the muniments of title. The owner must be guilty of some act or omission of such nature as to mislead an innocent person as to the true position of the title. (265)

2. SALE OF CHATTELS—*Title Acquired.* The general rule is that the buyer takes only such title as the seller has, and is authorized to transfer. (266)

3. —— *Exceptions—Negotiable Paper—Bills of Lading.* To this rule negotiable paper is an exception.

So also the transfer and delivery to a *bona fide* purchaser of a bill of lading, endorsed and delivered by the consignor and original owner.

But bills of lading are not negotiable in the broad sense in which the word is applied to negotiable paper. To bar the claim of the defrauded vendor, in such case, it must appear, (1) That he parted with the possession of the goods, or the muniments of title, with intent to pass title to the wrongdoer. A felonious taking, or a taking against the owner's consent confers no title even upon a subsequent *bona fide* purchaser without notice. (2) That the purchaser acquired title from the wrong-doer, without notice of the defects in his title, or of circumstances which would have put a reasonably prudent person upon inquiry as to the source of the title. (3) The purchaser must have made advances or incurred liabilities on the faith of the title so presented to him. (266-268)

A previous loan of money, set off against the price of the goods, will not suffice. (268)

Stewart had for years been in plaintiff's employ as sales agent, and never engaged in business for his own account. This was known to defendant, who had often dealt with him in his representative capacity. Stewart represented to defendant that he was about to undertake business on his own account; that he had taken over the product of a new mine, and desired defendant's patronage, offering as an inducement, to set off against the price of the purchase ($75), an indebtedness for money previously loaned him by defendant. The defendant assenting to the proposition, Stewart, shortly thereafter, came to defendant, producing bills of lading for coal, showing upon their face that the coal was from an old mine, the product of which had long been upon the market, and that the coal had been diverted to defendant through the agency of plaintiff. Defendant purchased the coal, deducting from the price the indebtedness of Stewart, and making payment of the balance within $32.00. (262-264)

*Held* that in any view of the case defendant was liable to plaintiff for the $75.00, not paid on the bill of lading, and for the $32.00 not paid at all; and that defendant's knowledge of the position of Stewart as the agent of plaintiff, and that, as appeared by the bills of lading, the coal had been shipped to plaintiff, should have put defendant upon an inquiry, which, if pursued, would have disclosed that plaintiff was the real owner of the coal. (269, 270)

4. PRINCIPAL AND AGENT—*Agent Acting for Self.* The principal is not responsible for the acts and representations of the agent while known to be acting for himself. (272)

5. PLEADING—*Error not Occasioning Surprise or Injury*, will not be considered upon appeal. (272)

6. APPEAL AND ERROR—*Judgment.* All the facts being admitted an erroneous judgment for defendant was reversed and judgment entered for the plaintiff. (272, 273)

*Error to Denver District Court.* HON. GREELEY W. WHITFORD, Judge.

MR. EDMUND J. CHURCHILL for plaintiff in error.

MR. CLAY B. WHITFORD, MR. HENRY E. MAY for defendant in error.

KING, J., delivered the opinion of the court.

For convenience, the plaintiff in error will be called the Fuel Company, and the defendant in error the Sparling Company.

The controversy here under consideration concerns only the counter-claim made by the Fuel Company against the Sparling Company, which was resolved in favor of the latter upon trial before the court without a jury. There is no dispute as to the facts, which, so far as necessary to state, are substantially as follows: Both companies were dealers in coal, handling the same in carload lots, and both having offices in the city of Denver. George E. Sparling was president and manager of the Sparling Company, and acted for it in all transactions involved herein. H. E. Stewart was, and for some years prior to said transactions had been, the general sales agent of the Fuel Company. Sparling had been acquainted with Stewart for about nine years, knew his agency for and business relations with the Fuel Company, and had purchased a considerable quantity of coal in carload lots from said company, through the said Stewart as its agent. He had never, prior to this transaction, purchased coal from Stewart as owner, or known of his selling any as such. At different times prior to the 16th day of December, 1910, the Sparling Company had loaned money to Stewart, in sums at that time aggregating $75 unpaid. About ten o'clock of that day, Stewart went to the office of the Sparling Company, and stated to Sparling that he had taken the output of a new mine in the Walsenburg field, which he was going to handle for himself until the next spring, at which time he intended to quit the employment of the Fuel Company, solicited the Sparling Company to become his customer, and offered to sell it coal from said mine at the regular price to jobbers. Sparling agreed to take three cars, for which Stewart stated that he would bring over the bills of lading. About twelve o'clock of the same day, he brought one bill of lading for a car of coal, upon receipt of which bill of lading the Sparling Company gave him a check for $75, which, together with

Stewart's indebtedness of $75, paid for that car, with the exception of a small balance. Two other bills of lading were delivered—one about the 20th, and one about the 24th, of December. Two of the cars of coal were delivered to the Sparling Company for shipment to its customer at Brush, Colorado, and the two bills of lading in evidence were endorsed by the Sparling Company to such customer. All the cars of coal belonged to the Fuel Company, and were received and appropriated by the Sparling Company. The delivery of the coal and bills of lading to the Sparling Company by Stewart was accomplished in the following manner: The cars had been shipped by the Primrose Coal Company from its mine at Rugby, Colorado, to the Diamond Fuel Company, as consignee, at Denver, Colorado, and, together with the original bills of lading, came into the rightful possession of the Rocky Mountain Fuel Company. The bills of lading delivered by Stewart to the Sparling Company were what are known as substituted bills of lading, in which the name of the original consignee was changed so as to show a shipment direct from the Primrose Coal Company at Rugby to the Sparling Company at Denver or Brush. It was shown that substitutes are usually procured from the railroad company by the original consignee or its agent or endorsee by delivering the original bills of lading to the railroad company and securing a new bill of lading with the name of the consignee and the destination changed. This was shown to be a common custom of the railroad companies and shippers of coal, well known to both parties to this suit, and that it was customary for sales agents to procure such substitution for their principals. After Stewart made the foregoing contract with the Sparling company, he caused the substitution to be made by which the original bills of lading were surrendered to the railroad company, and substituted bills of lading issued. These showed on their face that the substitution had been made at the written request of the Rocky Mountain Fuel Company, as agent for or representative of the

Primrose Coal Company. Stewart, in person, took the bills of lading to the Sparling Company. There was nothing on or about the bills of lading which showed or indicated that Stewart was the owner thereof, and nothing, aside from his possession, to indicate that he had a right to deal in or dispose of the coal represented by the bills. The Primrose Coal Company was not a new company; its mine was not a new mine. It does not appear that Stewart made any further representations as to the ownership of the coal at the time he delivered the several bills of lading, or any other representation than as made to Sparling at the time he agreed to buy. When the Fuel Company discovered the delivery of the coal to the Sparling Company, it made a demand upon that company for payment, and was then notified that the Sparling Company had bought the cars from Stewart personally, and denied liability to the Fuel Company. Sparling testified that he believed Stewart's statement; that he did not look at the bills of lading except to see that his company was the consignee, and that when they were delivered by Stewart, "he being in the position that he was holding, it was evidence to me that the car belonged to him;" that he had no suspicion that the coal belonged to the Fuel Company. His position is indicated by the following questions and his answers thereto:

"Q. What induced you to make the payments to Stewart? A. The very fact that he came to me with the proposition of having this coal; that he brought the bill of lading to me was absolute evidence to me of possession of the goods.

Q. Did you rely upon that? A. Yes, I would do it every time."

1. Upon the undisputed facts and the finding of the court, the only substantial question for determination is one of law, *viz.*, whether the Fuel Company is estopped from collecting the value of its coal from the Sparling Company which received and appropriated it. It is manifest that the Sparling Company cannot resist the claim of the Fuel Company to payment for the merchandise, except by establishing an equit-

able estoppel founded upon the acts of the Fuel Company, and by the application of the rule that, as between two persons equally innocent, a loss resulting from the fraudulent acts of another shall rest upon him by whose act the fraud has been made possible.   Such estoppel has been pleaded, and that it is relied on is evident from the following statement quoted from counsels' brief:

"In this case, The Rocky Mountain Fuel Company is, under the law above cited by us, estopped from collecting for this coal, because by its act in giving Stewart power to change the name of the consignee in the bill of lading, it has enabled Stewart to perpetrate the fraud."

The Fuel Company does not question the actual good faith or integrity of the Sparling Company, but contends that the bills of lading were received by it in such condition as, taken together with the other circumstances, were sufficient to put it upon inquiry as to the true owner, and therefore whatever loss befell was occasioned by the failure of the Sparling Company to make such inquiry as a prudent man should have made.  The rule invoked as an estoppel, though general in its terms, only operates to protect those who, in dealing with others, exercise ordinary caution and prudence, and as against those who have voluntarily conferred upon others the usual evidences or *indicia* of ownership of property, so that they have apparent authority to dispose of it; but it is not every parting with the possession of chattels or the documentary evidence of title that will enable the possessor to make good title to one who may purchase from him.  So far as such a parting with the possession is necessary in the business of life, or authorized by the custom of trade, the owner of the goods will not be affected by a sale by the one having the custody and manual possession of the goods or the *indicia* and muniments of title.—Clark & Skyles, Agency, p. 1189. The owner must go farther, and do, or omit to do, some act of a nature such as to mislead persons as to the true possession of the title.  The general rule of law is that a pur-

chaser of merchandise takes only such title as his seller has and is authorized to transfer; that he acquires precisely the interest, which the seller owns, and no other or greater. *"Nemo plus juris ad alium transferre potest quam ipse habet."* —*Broom, Max.* 452. "No one can transfer a better title than he himself possesses.—*Nemo dat qui non habet."* If this rule be applied to the instant case—and it must be, unless the facts preclude its application—the purchase of the bills of lading from Stewart conferred no title upon the Sparling Company, or right to make payment therefor to Stewart in his private capacity. To this rule there are some exceptions, one of which applies to negotiable instruments only, upon the law-merchant, and reasons of public policy upon which that branch of the law rests; another is the transfer, by endorsement and delivery, of a bill of lading to *bona fide* purchasers for value, by a consignee to whom the consignor and original owner of the goods has endorsed and delivered it, thereby placing the apparent title and ownership in such endorsee, in which case the bill of lading is regarded as the symbol or representative of the property itself. But bills of lading are not negotiable in the same sense that bills of exchange are said to be negotiable, nor with the same effect, but are rather regarded as *quasi*-negotiable.—Porter, Bills of Lading, section 438.

"Bills of lading differ essentially from bills of exchange and other commercial and negotiable instruments. Bills of lading are regarded as so much merchandise."—*Shaw v. R. R. Co.,* 101 U. S. 557, 565, 25 L. Ed. 892. Wherefore, the rule that applies to bills of exchange, viz., that "suspicion of defect of title, or the knowledge of circumstances which would excite such suspicion, in the mind of a prudent man, or gross negligence on the part of the taker at the time of the transfer, will not defeat his title," is not the rule with regard to bills of lading.—*Shaw v. R. R. Co., supra.*

In the case last cited it was said:

"The law has most carefully protected the ownership of personal property, other than money, against misappropriation by others than the owner, even when it is out of his possession. This protection would be largely withdrawn if the misappropriation of its symbol or representative could avail to defeat the ownership, even when the person who claims under a misappropriation had reason to believe that the person from whom he took the property had no right to it.  *  *  *  At least the purchaser of such a bill, with reason to believe that his vendor was not the owner of the bill  *  *  *  is not a *bona fide* purchaser, and he is not entitled to hold the merchandise covered by the bill against its true owner."

And the law is that the endorsee of a bill of lading who had notice of such facts as to put him on inquiry as to the right of the vendor to dispose of the merchandise, which inquiry, if pursued, would have led to notice of the true state of the title, must abide the consequences if he choose to run the risk.—*Decan v. Shipper*, 35 Pa. St. 239, 78 Am. Dec. 334; *Dows v. Perrin*, 16 N. Y. 325;; *Bertoli v. Smith*, 69 Vt. 425, 38 Atl. 76; *Squires v. Barber*, 37 Vt. 558; *Barnard v. Campbell*, 55 N. Y. 456, 14 Am. Rep. 289; Id., 58 N. Y. 73, 17 Am. Rep. 208.

In *Barnard v. Campbell, supra,* is found a discussion of the law of estoppel (as applied to facts so nearly parallel to those at bar as to make it a precedent), so sound and satisfactory in reasoning that we are disposed to adopt the same, so far as applicable, for the disposition of this case. Jeffries, a broker, sold to Campbell and others certain linseed, in payment of which they made and forwarded to Jeffries their notes. At the time of the sale and the delivery of the notes, Jeffries was not in possession of the seed, nor of the bills of lading. Shortly thereafter, he purchased the seed of the plaintiffs, and by fraudulent representations induced them to deliver it to him, whereupon he shipped it to Campbell &

Co., and forwarded to them a bill of lading, but did not pay for the seed. Plaintiff sued Campbell for the seed; defendants claimed an estoppel under the application of the same rule contended for by the Sparling Company in this case. The court said that several things must concur to bar the claim of the defrauded vendor: (1) He must have parted with possession of his property, or the muniments of title, with intent to pass the title to the wrongdoer, thus giving him the apparent right of disposal. If it either has been taken feloniously or without the consent of the owner, the taker can make no title to it, even to an innocent purchaser for value. (2) The purchaser must have acquired title from the wrongdoer without notice of the defects in his title, or knowledge of circumstances to put him to an inquiry as to the source of the title. (3) Such purchaser must have parted with value upon the faith of the apparent title of the wrongdoer and his right to dispose of the property.

In applying the principles stated, the instant case is naturally divided into two parts—(a) the liability of the Sparling Company for that portion of the purchase price which it attempted to pay by offsetting its loan of $75 to Stewart, and $32.44 of the said purchase price which it admits it had not paid to Stewart. Those two items come clearly within the principle that, in order that a purchaser of goods obtained from the owner by the fraud of a third person can hold them or their value as against the owner, he must have advanced money or incurred liabilities upon faith in the apparent title of the wrongdoer and his right to dispose of the property, and then only to the extent of the advances so made or liabilities incurred. There is no pretense that the loan (a part of which was made eleven months, and a part one month, before the sale of the coal) was made, or the money advanced, upon the credit of the bills of lading or the possession thereof; and as to that amount, as well as to the amount of the purchase price still retained by the Sparling Company, there is no element of estoppel, and judgment therefor should have

been given for the Fuel Company, without regard to the question of estoppel as to the amount which the Sparling Company actually paid upon or after the delivery of the bills of lading. It was so held in *Barnard v. Campbell, supra,* as to the entire purchase price which was paid before the merchandise or bills of lading were delivered. (b) Its liability for that part which it paid after receipt of the bills of lading. The trial court based its judgment upon a finding that the Sparling Company did not doubt the representations made by Stewart, and its conclusion that there was nothing in the transaction which would have put a prudent man on inquiry— "nothing which would arrest the attention of an ordinary prudent business man." This latter conclusion was an inference which the court drew from the facts in evidence. We think such inference is not legitimately deducible from the evidence. Stewart was the employee of the Fuel Company, and for several years had been its sales agent, and as such charged with the sale of coal for his principal, and had not engaged in like business for himself, all of which was well known to the Sparling Company, which had dealt with him frequently in his representative capacity. Under these conditions, he approached the Sparling Company, a customer of his principal, not in his capacity as agent, nor making any representations as such, but in his own interest, and represented that he was about to enter into business as a competitor of his principal; that he had taken over the product of a *new* mine; that he wished to supplant his principal as a seller of the same commodity, and solicited the Sparling Company to purchase from him, offering as an inducement an offset of money which he owed it for loans made. Upon this statement, and it alone, the purchase was made. Within two or three hours, Stewart produced a certain bill of lading which showed that the coal which he was delivering was not from a new mine as he had stated, but from an old mine; did not show that Stewart was the consignee or its endorsee but did show on its face that it had been diverted to the Sparling

Company by or through the agency of the Fuel Company, Stewart's principal. This bill, disclosing Stewart's falsehood, and that his principal had secured the substituted bill, taken together with the knowledge of Sparling that Stewart was, and for a long time had been, sales agent of the Fuel Company, constituted *prima facie* evidence, and to our mind, very strong evidence, that Stewart come into possession of the said bills of lading in his capacity as agent, and that the bills belonged to his principal; they were not—as he testified and contends—evidence that they belonged to Stewart—because of the fact that Stewart was holding the position he occupied as agent of the Fuel Company. The several bills of lading upon which the Sparling Company relies furnished such proof that, taken together with other circumstances in evidence, they should have put Sparling upon inquiry, which, if pursued, would have disclosed that the Fuel Company was the real owner of the coal, and had not authorized Stewart to so dispose of it. Sparling testified that he did not read the bills of lading, or notice anything, except that his company was made the consignee. For such failure he cannot charge the Fuel Company. His ignorance of the contents of the bills of lading was the result of his failure to exercise the caution of an ordinarily prudent business man. We think Sparling had reason to believe that Stewart had no right to negotiate these bills for his personal use. "It may fairly be assumed that one who has reason to believe a fact exists, knows it exists."—*Shaw v. R. R. Co., supra,* p. 566. Perhaps faith (which is the "substance of things hoped for") in the statements of a debtor is readily induced, or increased, when the fruit thereof is the collection of a bad loan, and such faith, so induced, may sometimes dull the sharp edge of suspicion, and result in forgetfulness, or neglect of ordinary and reasonable business prudence—especially when coupled with a lie well told. In *Barnard v. Campbell, supra,* it is said:

"Public policy requires that purchasers of property should be vigilant and cautious, at least to the extent of see-

ing that their vendors have some, and the usual, evidences of title, and if they are content to rest upon their declarations, they may not impose the loss, which is the result of their own incautiousness or credulity, on another."

We have already called attention to a principle, that is applied with some strictness in a case of this kind, viz., that the purchaser must have parted with his money, relying upon the bill of lading. That it did so rely in the instant case is not shown by the evidence. In fact, we think it is clearly shown that the manager relied on the representations of Stewart, and that his unwarranted credulity, and not any act or failure of the Fuel Company, enabled Stewart to perpetrate the fraud. That the manager did not rely on the bills of lading as evidence of Stewart's ownership of them or of the coal, is shown by the facts—(a) that there was nothing in or on the bill that indicated that Stewart had any interest in it or right to dispose of it; (b) there was that on the bill which would, if noticed, have excited his suspicion; (c) that he did not read or otherwise examine the bill, except to notice that his company was consignee. It is a waste of energy to insist that Sparling, as a prudent business man, expended substantial sums of money in reliance on a bill of lading in which he was not sufficiently interested to ascertain therefrom the name of the consignor, the place from which shipped, by whom the request for substitution was signed, or by whom the bill was endorsed, when he knew that he was not the original consignee, and when it also is shown that if he had examined it, the entire absence of any showing of right in Stewart to dispose of the coal would have appeared. Bare possession of the bills of lading by Stewart, not in his name, did not clothe him with power to dispose of them as though he were owner, and to the preclusion of the right of the real owner. He was not thereby clothed with the apparent ownership.—Clark & Skyles, Agency, section 236. There is no reason or equity in placing the burden of a fraudulent sale upon a *bona fide* owner rather than upon a *bona fide* pur-

chaser from a fraudulent vendor, unless the purchaser has parted with his money, relying upon some act or omission of the owner, by reason of which he has induced the purchaser to treat with a fraudulent vendor as owner.

Counsel for plaintiff in error argues certain exceptions which are based on objections to the reasons given by the trial court for its judgment. These objections and the argument thereon have been considered, but will not be discussed. It is often held that a court of review is not concerned in the process of reasoning by which a trial court arrived at a correct conclusion or judgment, but we have not heard it said, and think it not true, that a court of review is not concerned in the reasoning by which the trial court reached a conclusion upon which a judgment is based which apparently ought not to be sustained. The path into a jungle may serve to point the way out. From the remarks of the trial court in announcing its conclusion, it is fair to assume that it overlooked, or failed to give effect to, the familiar principle that an agent of a corporation while *known to be acting for himself* cannot be regarded as such agent, nor his principal made responsible for his acts or representations.

2. It is contended that the Fuel Company cannot recover on its counter claim, because it declares *in assumpsit*, whereas, the proof is of a *conversion*. Technically, this objection may be well taken, but it is a mere technicality. The Sparling Company, by one answer to the counter-claim—a plea in confession and avoidance—stated the conditions under which it took the coal, which showed a conversion, and which it sought to avoid by pleading estoppel. The case was tried upon that theory. There was no surprise. We think it may well be held that if the Fuel Company ought to have added a count in conversion to its counter-claim, that defect in pleading is cured, or should be disregarded. — Section 78, Mills' Code. It is manifest that no good would be accomplished by returning the case to the trial court, with leave to amend so as to plead conversion.

For the reason given, the judgment on the counter-claim is reversed, and the cause remanded with instructions to enter judgment thereon for the Fuel Company.

*Reversed and Remanded.*