MEADOW HOMES DEVELOPMENT CORP., a Colorado corporation, Counterclaim Plaintiff–Appellee,

v.

Ronald R. BOWENS, Counterclaim Defendant–Appellant.

No. 08CA1476.

Colorado Court of Appeals, Div. VII.

May 28, 2009.

Berenbaum, Weinshienk & Eason, P.C., Larry R. Martinez, Robin L. Nolan, Denver, Colorado, for Counterclaim Plaintiff–Appellee.

Campbell Killin Brittan & Ray, LLC, James D. Thorburn, Denver, Colorado, for Counterclaim Defendant–Appellant.

Opinion by Judge CONNELLY.

This case involves competing claims to a bond: a "security" covered by Revised Article 8 of the Uniform Commercial Code (UCC). *See* §§ 4–8–101 to –511, C.R.S.2008 (codifying Revised Article 8 in substantial part and in all parts relevant to this case). The parties who had or claimed interests in the bond were: (A) the original owners of the bond (collectively the Horvats); (B) appellee Meadow Homes Development Corp., the entity that was entitled to purchase the bond if the Horvats failed to close on the underlying property development; and (C) appellant Ronald R. Bowens, who purchased the bond from the Horvats. This opinion sometimes refers, as does the UCC commentary relied on by appellant, to the parties as A (the Horvats), B (Meadow Homes), and C (Bowens).

The issue arises because A fraudulently transferred the bond to C. C relies on the UCC's "protected purchaser" (formerly "bona fide purchaser") provision to claim he acquired greater interests than A actually had and thereby trumped B's interests. Because C had notice of B's property interests in the bond, he was not a protected purchaser. We affirm the judgment that B (Meadow Homes), not C (Bowens), was entitled to the bond.

## I. Background

The bond, issued by the Greatrock North Water and Sanitation District, was created by agreement of all parties during a multiphase development of land in Adams County. It is a limited tax bond covering the costs of acquiring domestic water improvements for the development.

The agreement provided that A would retain the bond if it closed on the relevant phase of the property development but "[i]f [A] does not acquire and develop [that property], [it] shall sell to [B] and [B] shall purchase from [A] the Bond for $50,000." A ultimately failed to close on the property. B received notice of A's default, closed on the property, and demanded the bond from A. A declined B's demand because, unbeknownst to B, A had transferred the bond to C through a series of intermediary transactions.

The ensuing litigation spawned plethoric claims, counterclaims, and cross-claims among numerous parties. It suffices for our purposes to note that B sued A and C for a declaratory judgment and order entitling it to the bond upon payment of the agreed-upon $50,000.

After a four-day bench trial, the trial court ruled B could recover the bond from C by paying $50,000. It found A had transferred the bond to C in derogation of B's rights. And it rejected C's contention that he should take the bond as a "protected purchaser" under UCC 8–303, § 4–8–303, C.R.S.2008. The court found C was not a protected purchaser because he had notice of B's adverse claim when he obtained the bond. Only C has appealed the ruling.

## II. The Merits

This appeal raises issues of first impression under Revised UCC Article 8 (Investment Securities), which have not previously been considered in Colorado and have received surprisingly little attention elsewhere. We review those legal issues de novo, but defer to the trial court's factual findings as long as they have record support. *See Albright v. McDermond*, 14 P.3d 318, 322 (Colo. 2000). Appellant Bowens, whom we some-

times refer to as C, specifically disclaims intent to challenge any of the trial court's factual findings. After review of his challenges, we affirm the judgment in favor of Meadow Homes, which we sometimes refer to as B.

### A. The general rule is that a purchaser cannot obtain greater rights than the seller had to transfer.

A purchaser generally "takes only such title as his seller has and is authorized to transfer"; "he acquires precisely the interest which the seller owns, and no other or greater." *Rocky Mountain Fuel Co. v. George N. Sparling Coal Co.*, 26 Colo.App. 260, 265–66, 143 P. 815, 818 (1914); *accord Commerce Bank v. Chrysler Realty Corp.*, 244 F.3d 777, 783–84 (10th Cir.2001) (predicting Kansas courts under UCC Article 9 would apply the "basic principle of commercial law encapsulated in the Latin phrase *nemo dat qui non habet:*" "He who hath not cannot give," which establishes the "basic concept" that "a transferee's rights are no better than those held by his transferor"); Russell A. Hakes, *UCC Article 8: Will the Indirect Holding of Securities Survive the Light of Day?*, 35 Loy. L.A. L.Rev. 661, 673 (2002) (discussing same rule in present context). This rule is codified in UCC 8–302(a), which provides (with two exceptions not applicable here) that a purchaser "acquires all rights in the security that the transferor had or had power to transfer." UCC 8–302(a), § 4–8–302(a), C.R.S.2008.

There is no longer any dispute that, as between A and B, B is entitled to the bond. A was required to sell the bond to B if: A failed to close on the property; B closed instead; and B made proper demand. All those events occurred. Absent some exception to the general rule, purchaser C stands in the shoes of seller A and must now sell the bond to B for the agreed-upon price of $50,000.

### B. The purchaser here was not a "protected purchaser" acquiring rights greater than the seller held because he had prior notice of another's adverse claim.

Purchaser C could have obtained rights greater than seller A had against B only if C qualified as a "protected purchaser" under UCC 8–303(b), section 4–8–303(b) (such a purchaser acquires not only the rights of the seller but "also acquires its interest in the security free of any adverse claim"). This provision: (1) "allocat[es] the burden and risk of pursuing the bad actor transferor between two groups of innocents," *see In re Enron Corp.*, 379 B.R. 425, 448 (S.D.N.Y.2007) (discussing similar provision); and (2) helps ensure marketability of investment securities by bringing "finality" to transactions. *See* James Steven Rogers, *Policy Perspectives on Revised U.C.C. Article 8*, 43 UCLA L.Rev. 1431, 1462 (1996).

The three requirements for protected purchaser status are that the purchaser has: (1) "[g]ive[n] value"; (2) "not ha[d] notice of any adverse claim to the security"; and (3) "[o]btain[ed] control of" the security. UCC 8–303(a), § 4–8–303(a). To "qualify as a protected purchaser there must be a time at which all [three] of the requirements are satisfied." UCC 8–303(a), § 4–8–303(a) official cmt. 2; *accord* 17 *Williston on Contracts* § 51:57, at 783 (4th ed.2000). While Article 8 could be clearer on this point, there is general agreement that the burden of proving each of these requirements is on the party claiming protected purchaser status. *See* 7 Hawkland UCC Series, § 8–105:06, at 58–60 (1998) (discussing *Young v. Kaye*, 443 Pa. 335, 279 A.2d 759, 764–66 (1971)).

The trial court assumed, without expressly finding, that C satisfied the first requirement by giving value to A for the bond. Nor is the third requirement disputed because C plainly obtained control of the bond. The trial court's ultimately dispositive ruling was that C did not satisfy the second requirement because it had notice of B's adverse claim at the time it obtained control of the bond.

#### 1. C had notice of B's interest in the bond.

What constitutes "[n]otice of [an] adverse claim" is set forth in UCC 8–105(a), § 4–8–105(a), C.R.S.2008. As relevant here, a purchaser has notice if he either: (1) has actual knowledge of the adverse claim; or (2) "is

aware of facts sufficient to indicate that there is a significant probability that the adverse claim exists and deliberately avoids information that would establish the existence of the adverse claim." *Id.* The latter is "intended to codify the 'willful blindness' test." UCC 8–105(a), § 4–8–105(a) official cmt. 4. Notice requires not just awareness that someone other than the transferor has a property interest in the security but also that "the transfer violates the other party's property interest." *Id.* official cmt. 2.

■ The trial court found C had notice of B's adverse claim to the bond. While C professes not to challenge any of the trial court's factual findings, he nonetheless denies having notice of B's adverse claim. We could reject this fact-specific argument based simply on C's appellate failure to provide the trial transcript because "a judgment is presumed to be correct until the contrary affirmatively appears." *See Schuster v. Zwicker,* 659 P.2d 687, 690 (Colo.1983).

■ Even the limited appellate record provided by C reveals ample support for finding that C, at the very least, was willfully blind to the fact that the transfer was adverse to B's rights in the bond. C, after all, *signed* the settlement agreement that created A's and B's respective interests in the bond. As such, he indisputably had actual knowledge of B's right to demand the bond if A failed to close on the property.

C argues he was never shown to have known that B had continuing interests in the bond, particularly because C obtained the bond a couple of months after the scheduled closing date when C should have been free to assume either that A had closed or that B's interests otherwise had terminated. Given C's involvement in the agreement creating A's and B's respective interests, however, he had the ability to determine the status of B's continued interests before acquiring the bond from A. Even if C lacked actual knowledge of those interests (a generous assumption on this record), he could be found to have willfully blinded himself to those interests. There was no error in the trial court's finding that C had notice of B's adverse claim.

2. B had a protectable property interest in the bond.

C's more substantial argument is that B's claim to the bond did not rise to the level of a "property interest" sufficient to constitute an adverse claim. This argument relies on the legal definition of "adverse claim" in UCC 8–102(a)(1), § 4–8–102(a)(1), C.R.S.2008, and its accompanying commentary.

The UCC 8–102(a)(1) definition of an "adverse claim" requires that a claimant "has a *property interest* in a financial asset," § 4–8–102(a)(1) (emphasis added). The commentary explains that this definition, as amended in the 1994 revisions and adopted in Colorado in 1996, was intended to reject case law that "might have been read to suggest that any wrongful action concerning a security, even a simple breach of contract, gave rise to an adverse claim." UCC 8–102(a)(1), § 4–8–102(a)(1) official cmt. 1 (rejecting such reading of *Pentech International, Inc. v. Wall Street Clearing Co.,* 983 F.2d 441 (2d Cir. 1993), and *Fallon v. Wall Street Clearing Co.,* 182 A.D.2d 245, 586 N.Y.S.2d 953 (1992)). C deems this case "nearly identical" to a hypothetical in the commentary, which states (using the same "A–B–C" shorthand references to parties we have used):

> Suppose, for example, that A contracts to sell or deliver securities to B, but fails to do so and instead sells or pledges the securities to C. B, the promisee, has an action against A for breach of contract, but absent unusual circumstances the action for breach would not give rise to a property interest in the securities. Accordingly, B does not have an adverse claim.

*Id.*

Thus, "absent *unusual circumstances,*" "a *simple* breach of contract" does not by itself establish a "property interest" required for an adverse claim to a security. *Id.* (emphases added). The language we have emphasized is significant, as the official UCC commentary goes on to explain: "An adverse claim might, however, be based upon principles of equitable remedies that give rise to property claims." *Id.*

■ The present case involves "unusual circumstances" entitling B to "equitable rem-

edies." While A clearly did breach its contract with B, "the fact that the action involves a breach of contract can hardly be enough to prove relief is not equitable." *Sereboff v. Mid Atlantic Medical Services, Inc.,* 547 U.S. 356, 363, 126 S.Ct. 1869, 164 L.Ed.2d 612 (2006). In the language of the UCC .commentary, A's inequitable actions toward B involve much more than "a *simple* breach of contract."

At least two factors make this an unusual case in which B had more than a simple breach of contract action. Given these factors, we hold the trial court properly ruled that B was entitled to the bond itself and was not limited to seeking monetary damages.

First, when it transferred the bond to C, A did more than simply breach a contract: the trial court found A acted "in a fraudulent manner" that "was intended to hinder and defraud the rights of [B]." In support of this ultimate finding, the court found the transfer was concealed from B, represented substantially all of A's assets, and rendered A insolvent.

Second, this particular bond was sufficiently unique to give rise to an equitable property interest in favor of B. The bond was not a fungible investment security. Rather, it was created as part of a land development project, and ownership of the bond pivoted on which party ultimately bought and developed the land. We cannot assume the parties acted fortuitously in deciding to tie bond ownership to land development. Because B ultimately bought and was responsible for developing the land, its interest in and right to the bond outweighed any competing claim of C.

■ The court's equitable remedy, awarding B the bond itself, was in the nature of a constructive trust: a "flexible equitable remedy that may be imposed to prevent unjust enrichment" by "enabl[ing] the restitution of property that in equity and good conscience does not belong to the defendant." *Lawry v. Palm,* 192 P.3d 550, 562 (Colo.App.2008) (providing extensive citations of Colorado case law). C's legal argument—that B had only contractual, not property, interests— might carry the day in another case because a transferor's simple breach of contract does not outweigh the need for finality in securities transfers. But, under the circumstances of this case, equity overrides the legal argument.

■ We finally reject C's argument that B could not have had a property interest because its right to the bond had not yet ripened at the time of transfer. A property interest may exist even where an owner's rights are contingent on future events. *See Baker v. Young,* 798 P.2d 889, 893–94 (Colo. 1990) (rights under insurance contract constituted a "property interest" even though they were "contingent on future events"); *In re Marriage of Grubb,* 745 P.2d 661, 665 (Colo. 1987) (similar regarding spousal rights under vested pension plan).

### III.   Remaining Issues

#### A.   Appellant's Other Contentions

Bowens makes other contentions that we do not need to address. He argues, for example, that Meadow Homes was not entitled to relief under the Colorado Uniform Fraudulent Transfer Act (CUFTA), sections 38–8–101 to –112, C.R.S.2008. This is a moot point because while Meadow Homes asserted a CUFTA claim, the trial court did not grant relief under the Act.

■ Bowens' reply brief also suggests that the settlement agreement creating Meadow Homes' right to the bond violated the rule against perpetuities. It is doubtful the rule even applies in this context. *See* Cathy Stricklin Krendl, 2A *Colo. Prac., Methods of Practice* § 72.27, at 187 (5th ed.2007) (§ 15–11–1105(1)(a), C.R.S.2008, generally "limits the application of the rule against perpetuities to donative transfers of property, thereby freeing commercial transactions from the rule's arcane vesting requirements"). In any event, "we do not consider arguments raised on appeal for the first time in a reply brief." *IBC Denver II, LLC v. City of Wheat Ridge,* 183 P.3d 714, 718 (Colo.App.2008).

#### B.   Appellee's Request for Attorney Fees

■ Meadow Homes asks us to award appellate attorney fees against Bowens under the settlement agreement. This agreement,

to which Bowens was signatory, entitled a prevailing party to attorney fees "incurred in the prosecution or defense of the action, including any appeal," should "any action be commenced to enforce this Agreement, or should any action be commenced relating to this Agreement or any of its terms or provisions." We construe contractual fee-shifting provisions de novo to determine whether they entitle prevailing parties to attorney fees. *Harwig v. Downey,* 56 P.3d 1220, 1221–22 (Colo.App.2002).

The contractual attorney fees provision is very broad: it covers not simply actions to "enforce" the agreement but also actions "relating to [it] or any of its terms or provisions." The "ordinary meaning of ['relating to'] is a broad one—'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with.'" *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 383–84, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (quoting *Black's Law Dictionary* 1158 (5th ed.1979)), *discussed in Altria Group, Inc. v. Good,* —— U.S. ——, ——, 129 S.Ct. 538, 548, 172 L.Ed.2d 398 (2008); *see also Harwig,* 56 P.3d at 1222 ("We agree with plaintiffs that, in light of the broadly worded phrase 'any ... litigation relating to this contract,' the provision would apply in litigation between the contracting parties concerning a breach of the lease to which the sales contract was subject."). And it covers litigation relating not just to the contract itself but to "any of its terms or provisions."

This litigation and this appeal plainly "related to" the agreement's terms and provisions. Meadow Homes' right to the bond originated in this agreement, and both sides' briefs quoted extensively from the agreement to support their contentions.

■ Bowens offers no argument as to why this case does not relate to the agreement. Instead, his only argument against an award of appellate fees is that "the trial court already ruled upon the issue" (when it declined to award trial court fees) and Meadow Homes did not appeal this ruling, so "any further consideration" of the issue "is barred" by C.A.R. 4(a) and *Laugesen v. Witkin Homes, Inc.,* 29 Colo.App. 58, 479 P.2d 289 (1970) (involving when appellate time limits may be extended for excusable neglect).

The flaw in this argument is that the trial court did not decide and could not have decided whether Meadow Homes was contractually entitled to appellate attorney fees. It did decline to award trial court fees against Bowens, reasoning that Meadow Homes "did not sue Mr. Bowens because of any breach of the Settlement Agreement." That reasoning was incomplete because the fee-shifting provision covered not only actions to enforce the agreement but also actions relating to any of its provisions. While the failure to cross-appeal has forfeited any right to trial court fees, it has no effect on Meadow Homes' request for appellate fees.

## IV. Conclusion

The judgment is affirmed, and the case is remanded for the trial court to assess and award against Bowens the attorney fees reasonably incurred by Meadow Homes in this appeal.

Judge RUSSEL and Judge J. JONES concur.