**WHITING OIL AND GAS CORPORATION, f/k/a Equity Oil Company, Plaintiff–Appellee,**

v.

**ATLANTIC RICHFIELD COMPANY, Defendant–Appellant.**

**No. 09CA1081.**

Colorado Court of Appeals, Div. III.

Sept. 2, 2010.

---

Welborn Sullivan Meck & Tooley, P.C., Keith D. Tooley, Kathryn Haight, Blake M. Pickett, Denver, Colorado, for Plaintiff–Appellee.

Davis Graham & Stubbs LLP, Shannon Wells Stevenson, Elizabeth H. Titus, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge BOORAS.

In this action concerning the exercise of a contractual option to purchase real property, defendant, Atlantic Richfield Company (ARCO), appeals the trial court's judgment in favor of plaintiff, Whiting Oil and Gas Corporation, formerly Equity Oil Company (Equity). We affirm.

## I.  Factual Background

In 1968, ARCO and Equity entered into an agreement (1968 agreement) involving three parcels of land in western Colorado: the Boies Block, the Figure Four Claims, and the Sunset claims. Equity owned undivided interests in the surface estates and mineral estates of each parcel.

As part of the 1968 agreement, ARCO purchased 50% of Equity's interest in the Boies Block, 80% of Equity's interest in the Figure Four Claims, and an option to purchase 80% of Equity's interest in the Sunset claims. The purchase price for these interests was $26 million, of which more than 90% was allocated to the Figure Four Claims. The 1968 agreement further provided that Equity would convey to ARCO an additional 30% interest in the Boies Block (additional conveyance) if the parties were not recovering commercial quantities of oil from the parcel within 15 years.

Pursuant to the 1968 agreement, ARCO and Equity also agreed to embark on a 10–year oil shale research and development pro-

ject (R & D project) on the Boies Block involving in-situ (underground) extraction. Prior to the 1968 agreement, Equity had performed oil shale research on the Boies Block, but had suspended the research due to lack of money. ARCO committed $2 million to the R & D project, and Equity agreed to conduct the research. The R & D project was to be devised and adopted by a committee consisting of two Equity representatives and one ARCO representative, and was to terminate upon ARCO's expending $2 million or the expiration of 10 years, whichever occurred first.

Also pursuant to the 1968 agreement, the parties agreed that any patents arising from the R & D project would be owned jointly and equally by the parties. The parties agreed to share all information regarding research conducted under the R & D project.

Both parties substantially performed their obligations to complete the R & D project. The parties also performed their payment and transfer obligations with respect to the Boies Block and the Figure Four Claims.

In 1977, the parties amended the 1968 agreement to incorporate a further in-situ oil shale production research project on the Boies Block (1977 amendment). The parties agreed that the original R & D project was not terminated, but suspended due to lack of money. The 1977 amendment acknowledged that Equity was pursuing a grant from the United States Department of Energy (DOE) for in-situ research and that, if Equity received the DOE grant, it would continue the R & D project. The 1977 amendment did not require Equity to engage in any additional research outside of the scope of the original R & D project and the prospective DOE grant.

Equity received an $8 million DOE grant and performed research on in-situ production under the grant from 1977 to 1982. Equity contributed an additional $3 million toward the research. ARCO did not contribute funding for the research, but it committed to reimburse Equity for some of its costs if the research led to the production and sale of oil.

Equity substantially performed its obligation to conduct research under the 1977 amendment. ARCO's obligation to reimburse Equity for some of its costs was never triggered, because the research did not lead to the production and sale of oil. In 1982, the oil shale industry in the area abruptly came to a halt.

In 1983, the parties again amended the 1968 agreement (1983 amendment). As relevant here, the 1983 amendment granted Equity an option to purchase all of ARCO's interest in the Boies Block (Option) and postponed the triggering of the additional conveyance to February 1, 2008. Under the 1983 amendment, ARCO retained the right to cancel the option at any time, with the exception that Equity was granted right of first refusal in the event ARCO received an offer from another party to buy its interest in the Boies Block.

In April 2006, Equity sent a letter to ARCO exercising the Option. In October 2006, ARCO sent Equity a letter stating that it would not honor the Option because it was unenforceable, and that ARCO was exercising its right to cancel the Option.

In November 2006, Equity filed a complaint in the trial court seeking specific performance of the Option, the imposition of a constructive trust on the Boies Block, a declaratory judgment that Equity was the owner of all the interests in the Boies Block held by ARCO, and damages for breach of contract. ARCO counterclaimed against Equity to quiet title in its interests in the Boies Block and for a declaratory judgment that Equity did not properly exercise the Option in accordance with the 1983 amendment.

Both parties moved for summary judgment, and ARCO moved for judgment on the pleadings. As relevant here, ARCO asserted that the Option violated the common law rule against perpetuities (common law rule), and was therefore unenforceable, and that the doctrine of unclean hands barred Equity's claim for specific performance. Equity asserted that the common law rule did not apply to the Option and, even if it did, the Option could be reformed under section 15–11–1106(2), C.R.S.2009 (reformation provi-

sion[1]).

In June 2008, the trial court denied ARCO's motions. The court found that ARCO had failed to demonstrate that there was no genuine issue of material fact with respect to Equity's allegedly unclean hands, and ARCO was therefore not entitled to summary judgment based on that defense. The court also found that the Option violated the common law rule, because it named no life in being and could be exercised more than 21 years after the parties entered into the 1983 amendment. However, the court concluded that summary judgment was inappropriate, because Equity might be entitled to statutory reformation of the Option under the reformation provision.

In a motion to amend the court's ruling, ARCO argued for the first time that the application of the reformation provision would be unconstitutionally retrospective. The trial court rejected this argument and denied ARCO's motion.

At trial, ARCO argued that Equity committed breaches of contract, including breach of its duty of good faith and fair dealing, by leading ARCO to believe that Equity was conducting research into in-situ production on the Boies Block at the time leading up to the 1983 amendment, and that this breach relieved ARCO of its obligation to honor the Option. ARCO also argued that the common law rule barred enforcement of the Option, and that the doctrine of unclean hands barred Equity's claim for specific performance.

The trial court found that Equity breached its duty of good faith and fair dealing, its obligation under the 1968 agreement to assign to ARCO a 50% interest in a patent Equity obtained that had arisen from the R & D project, and its obligation under the 1968 agreement to share with ARCO information about its oil shale research. However, the court concluded that Equity's breaches were not materially related to the Option, and therefore did not excuse ARCO from its obligation to honor the Option. The court found that Equity's breaches were not mate-

rial because the 1983 amendment, unlike the 1968 agreement and the 1977 amendment, concerned "an intricate network of property conveyances and rights to future conveyances," and the "general benefits of land and mineral ownership," not oil shale research.

Next, the trial court reiterated its earlier conclusion that the Option violated the common law rule. The court reformed the Option pursuant to the reformation provision to terminate unless it was exercised no later than 21 years after the death of Equity's former president, thus bringing the Option into compliance with the common law rule.

The trial court's judgment addressed ARCO's unclean hands defense, if at all, only by stating "[o]ther defenses of affirmative defenses (such as waiver and abandonment) were not pursued at trial and, in any event, were not established by the evidence." No part of the court's judgment expressly mentioned ARCO's unclean hands defense.

The trial court concluded that Equity was entitled to specific performance of the reformed Option, and imposed a constructive trust on ARCO's interest in the Boies Block until ARCO delivered the deed required by the court's judgment.

## II. Material Breach

■ ARCO contends that the trial court erroneously concluded that Equity's breaches were not materially related to the Option, and therefore did not excuse ARCO from its obligation to honor the Option. We disagree.

■ Whether a contract has been materially breached, thus excusing future performance, is a question of fact. *Coors v. Sec. Life of Denver Ins. Co.*, 112 P.3d 59, 64 (Colo. 2005); *Kaiser v. Mkt. Square Disc. Liquors, Inc.*, 992 P.2d 636, 640 (Colo.App.1999). Accordingly, we may disturb the trial court's finding only if it is clearly erroneous and not supported by the record. *See R.A. S. Builders, Inc. v. Euclid & Commonwealth Assocs.*, 965 P.2d 1242 (Colo.1998).

---

1. Separate sections provide for reformation of nonvested property interests or powers of appointment created after May 31, 1991 that are invalidated under section 15–11–1102.5, C.R.S. 2009. *See* § 15–11–1104.5(1) & (2), C.R.S.2009.

Here, the trial court found that the parties entered into the 1968 agreement and later amendments not simply to conduct oil shale research, but for purposes related to the "general benefits of land and mineral ownership." Ninety percent of the purchase price ARCO paid for interests in the Boies Block, the Figure Four Claims, and the Sunset claims was allocated to the Figure Four Claims, and ARCO does not contend that the parties agreed to conduct oil shale research on any parcel but the Boies Block. Furthermore, the 1983 amendment, which contained the Option, did not impose on the parties any obligations with respect to conducting further oil shale research. As the trial court noted, this change in the parties' focus coincided with the abrupt cessation of the oil shale industry in the area in 1982, a fact ARCO does not dispute.

The record supports the trial court's finding that Equity's breaches, which concerned only oil shale research and its obligations under the R & D project, were not materially related to the Option. Accordingly, we do not disturb the trial court's conclusion that Equity's breaches did not excuse ARCO from its obligation to honor the Option.

### III. Reformation of the Option

■ ARCO contends that the trial court erred when it reformed the Option pursuant to the reformation provision, because that statute applies only to probate instruments. We disagree.

■ In addition, because we conclude that the trial court properly applied the reformation provision, we do not address Equity's argument that, because ARCO retained the right to cancel the Option at any time, the common law rule does not apply, and that we should affirm the trial court's judgment on that basis. Generally, an option to purchase real estate is within the common law rule. *See Perry v. Brundage,* 200 Colo. 229, 234, 614 P.2d 362, 366 (1980); *Atchison v. City of Englewood,* 170 Colo. 295, 305–06, 463 P.2d 297, 302 (1969); *Rocky Mountain Fuel Co. v. Heflin,* 148 Colo. 415, 421, 366 P.2d 577, 580 (1961). We do not reach in this opinion whether a *revocable* option is subject to the common law rule.

Statutory interpretation is a question of law we review de novo. *Bostelman v. People,* 162 P.3d 686, 689 (Colo.2007). Our primary task when construing a statute is to give effect to the General Assembly's intent. *Id.* To determine the legislature's intent, we first look to the plain language of a statute. *Id.* at 690. All general terms must be liberally construed, taking into account the context of the entire title or article. *See* § 2–4–212, C.R.S.2009; *Bob Blake Builders, Inc. v. Gramling,* 18 P.3d 859, 862 (Colo.App.2001).

In 1991, the General Assembly adopted the Colorado Statutory Rule Against Perpetuities Act (Act), sections 15–11–1101 to –1107, C.R.S.2009. *See Argus Real Estate, Inc. v. E–470 Public Highway Authority,* 109 P.3d 604, 610 (Colo.2005). The Act was closely modeled on the Uniform Statutory Rule Against Perpetuities (USRAP) authored by the National Conference of Commissioners on Uniform State Laws. *Id.* (citing Cathy Stricklin Krendl, 2A Colo. Prac., Methods of Practice § 72.27, at 187 (5th ed.2007)). The General Assembly declared that the Act "supersedes and abolishes the rule of the common law known as the rule against perpetuities." § 15–11–1107(2), C.R.S.2009. The Act applies primarily to transactions that occur after its effective date. *See* §§ 15–11–1101 to –1105 & –1106.5 to –1107 (all concerning transactions occurring after May 31, 1991).

The General Assembly limited the types of interests that can be invalidated by the Act. Except in circumstances not at issue here, the Act "as set forth in sections 15–11–1102 and 15–11–1102.5, does not apply to invalidate ... [a] nonvested property interest or a power of appointment arising out of a nondonative transfer." § 15–11–1105(1)(a), C.R.S.2009. This provision generally "limits the application of the rule against perpetuities to donative transfers of property, thereby freeing commercial transactions from the rule's arcane vesting requirements." *Meadow Homes Development Corp. v. Bowens,* 211 P.3d 743, 748 (Colo.App.2009) (quoting Krendl, 2A Colo. Prac., Methods of Practice § 72.27, at 187).

The only section of the Act that applies to nonvested property interests or powers of

appointment created before the effective date of the Act is section 15–11–1106(2), the reformation provision at issue in this case. This section provides:

> If a nonvested property interest or a power of appointment was created before May 31, 1991, and is determined in a judicial proceeding, commenced on or after May 31, 1991, to violate this state's rule against perpetuities as that rule existed before May 31, 1991, a court upon the petition of an interested person shall reform the disposition by inserting a savings clause that preserves most closely the transferor's manifested plan of distribution and that brings that plan within the limits of the rule against perpetuities applicable when the nonvested property interest or power of appointment was created.

§ 15–11–1106(2). The reformation provision does not exclude from its application nondonative transfers, or any other kind of transfer. *See id.*

Nevertheless, ARCO argues that the reformation provision does not apply here because the provision instructs courts to effect a reformation "that preserves most closely the transferor's manifested plan of distribution," § 15–11–1106(2), and the Option is not a "plan of distribution." We disagree.

We acknowledge that the term "plan of distribution," especially when used in a provision codified in the probate code, might seem to limit the reformation provision to probate instruments. However, the reformation provision expressly applies to "nonvested property interest[s] and power[s] of appointment ... created before May 31, 1991" that are determined "to violate this state's rule against perpetuities as that rule existed before May 31, 1991." *Id.* We decline to infer that the use of probate terminology to describe the manner in which courts must conduct reformation limits the broad language identifying the interests and powers of appointment subject to reformation.[2]

We find instructive a study of other jurisdictions that have adopted versions of the USRAP. It is crucial to note that seemingly minor modifications to the USRAP produce fundamentally different results.

Versions of the USRAP adopted in some states expressly exclude all property interests and powers of appointment arising from nondonative transfers from the operation of the entire USRAP, which includes provisions that invalidate interests that were created after the effective date of that state's version of the USRAP, and the reformation of instruments that violate the new statutory rule against perpetuities or the common law rule. *See, e.g.,* Ariz.Rev.Stat. § 14–2904 (2009); Cal. Prob.Code § 21225 (2009); Ind.Code § 32–17–8–2 (2009). Accordingly, these states' reformation provisions would generally be inapplicable to commercial transactions, regardless whether the property interest at issue was created before or after the effective date of that state's version of the US-RAP. *See, e.g., Wedel v. American Elec. Power Service Corp.,* 681 N.E.2d 1122, 1138 (Ind.Ct.App.1997) ("[Indiana's act] does not apply to nondonative transfers. Therefore, the reformation provisions do not apply in this case." (citation omitted)).

Versions of the USRAP adopted by Colorado and some other states, by contrast, contain a narrower exclusion concerning nondonative transfers. These versions only exclude property interests and powers of appointment arising out of nondonative transfers created after the effective date of the Act from the operation of the new statutory rule against perpetuities. *See* §§ 15–11–1102.5, 15–11–1105(1), C.R.S.2009; *see also* Mass. Gen. Laws ch. 184A, §§ 1, 4 (2009); S.C. Codified Laws §§ 27–6–20, 27–6–50 (2009). The difference is two-fold; the exclusion is limited to property interests or powers of appointment that are invalidated under the new statutory rule against perpetuities, and the exclusion only applies to property interests or powers of appointment

---

**2.** Our conclusion that the reformation provision applies here is consistent with the supreme court's opinion in *Argus,* 109 P.3d 604, in which a party sought reformation of an option in a commercial instrument that was created before the effective date of the Act and that violated the common law rule. However, the *Argus* opinion did not directly address the application of the reformation provision to commercial options, because the supreme court found that the doctrine of claim preclusion barred reformation in that case. *Id.* at 610.

created after the effective date of the Act. Under this statutory scheme, a reformation provision aimed at property interests or powers of appointment created before the effective date of the Act would logically apply to all interests, whether or not they arose from nondonative transfers. *See Peterson v. Tremain,* 35 Mass.App.Ct. 422, 621 N.E.2d 385, 386 n. 1 (1993) (suggesting that reformation provision in Massachusetts' Act could have applied to option in commercial agreement if suit had been brought after the statute's effective date); *Queen's Grant II Horizontal Property Regime v. Greenwood Dev. Corp.,* 368 S.C. 342, 628 S.E.2d 902, 917 (App.2006) (in dispute concerning commercial agreement, describing the applicable reformation provision as "holding that ... courts must reform a disposition that was created before July 1, 1987 by inserting a savings clause that preserves the transferor's plan of distribution 'within the limits of the rule against perpetuities'" (quoting S.C. Codified Laws § 27–6–60(B))).

■ Furthermore, the application of the reformation provision to all interests invalidated under the common law rule comports with a major policy goal of Colorado's version of the USRAP. The Act "seeks to make interests valid *whenever possible* and to give effect to the intent of the donor, even if the court must reform the instrument to carry out that intent," and "expresses clear disfavor towards strict application of the rule against perpetuities." *Argus,* 109 P.3d at 614–16 (Kourlis, J., dissenting) (citing Krendl, 2A Colo. Prac., Methods of Practice § 72.1, 160–161 (4th ed.1998)) (emphasis in original). The General Assembly excluded nondonative transfers from being invalidated under the new statutory rule and provided for the reformation of instruments that were created before the effective date of the Act. It would be odd if the General Assembly intended to allow the common law rule to continue to invalidate only interests created by nondonative transfers, the very type of transfer the drafters of the USRAP aimed to move outside the operation of the rule against perpetuities altogether. *See* Unif. Rule Against Perpetuities, 8B U.L.A. 232, 280 (2001). Also, "[i]t cannot be presumed that that the legislature intended to provide

greater protections for property interests created after the enactment of the statute than for those in existence at the time of its creation." *Argus,* 109 P.3d at 615 (Kourlis, J., dissenting).

Finally, we reject ARCO's contention that the Act's placement in the probate code indicates that the General Assembly intended it to apply only to wills and trusts. The General Assembly included no such limitation in its declaration that the Act "supersedes and abolishes the rule of the common law known as the rule against perpetuities," § 15–11–1107(2), and the Act's placement in the probate code does not imply a contrary legislative intent. *Cf. People v. Borghesi,* 66 P.3d 93, 102 (Colo.2003) (declining to infer that statutory designation of robbery as an offense against property as opposed to an offense against the person indicates legislative intent to treat robbery statutes as primarily protective of property).

Furthermore, the General Assembly expressly distinguished between donative and nondonative transfers in section 15–11–1105(1). Had the General Assembly intended the Act to apply only to transfers made in wills and trusts simply by codifying the Act in the probate code, it would have been unnecessary to make such a distinction.

## IV. Retrospective Application

■ ARCO next contends that the trial court's application of the reformation provision to the Option was unconstitutionally retrospective, because it took away ARCO's vested rights in the Boies Block. We disagree.

Because some retroactively applied legislation is constitutional while some is not, Colorado courts use the term "retrospective" to describe a statute whose retroactive application is unconstitutional. *In re Estate of DeWitt,* 54 P.3d 849, 854 (Colo.2002). Determining whether a statute is retrospective involves a two-step inquiry. *Id.*

■ First, in order to overcome the presumption that the statute functions only prospectively, the statute must reveal a clear legislative intent of retroactivity. *Id.*

■ Second, if the General Assembly intended the statute to operate retroactively, the statute is unconstitutionally retrospective if it " 'takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past.' " *Id.* (quoting *Denver S. Park & Pac. Ry. Co. v. Woodward,* 4 Colo. 162, 167 (1878)). However, where a statute effects a change that is procedural or remedial, rather than impacting a vested right, it may be applied retroactively. *American Comp. Ins. Co. v. McBride,* 107 P.3d 973, 977 (Colo.App.2004). "For purposes of retrospectivity analysis, substantive statutes involve the creation, elimination, or modification of vested rights or liabilities, while procedural statutes relate only to remedies or procedures to enforce such rights or liabilities." *Pollock v. Highlands Ranch Cmty. Ass'n,* 140 P.3d 351, 354 (Colo.App.2006).

Here, as to the first step, the reformation provision applies to "nonvested property interest[s] or . . . power[s] of appointment . . . created before May 31, 1991." § 15–11–1106(2). The statute thus reveals a clear legislative intent to retroactively apply the reformation provision to interests and powers of appointment created before its effective date.

As to the second step, we agree with ARCO that its interests in the surface and mineral estates of the Boies Block were vested interests. However, the reformation provision is remedial in nature, *see Argus,* 109 P.3d at 610, and its application did not take away or impair ARCO's vested interests. The reformation provision operated on the Option, a contractual agreement between the parties, giving effect to the intent of the parties by saving the Option from violating the common law rule. ARCO had no vested interest in its contractual agreement not being enforced, and it does not contend that it entered into the 1983 amendment in reliance upon the Option being unenforceable.

Accordingly, the trial court's application of the reformation provision was not unconstitutionally retrospective.

## V. Unclean Hands

■ .Finally, ARCO contends that it prevailed, as a matter of law, on its unclean hands defense, because the trial court found that Equity breached its duty of good faith and fair dealing, which was the basis for ARCO's unclean hands defense. We disagree.

After finding that ARCO had failed to demonstrate that Equity's breaches relieved ARCO of its obligation to honor the Option, the trial court's judgment stated "[o]ther defenses or affirmative defenses (such as waiver and abandonment) were not pursued at trial and, in any event, were not established by the evidence." Although this finding did not expressly name ARCO's unclean hands defense, it did not exclude it. Regardless whether ARCO abandoned its unclean hands defense, as Equity contends it did, the trial court determined that the evidence did not establish that Equity came to court with unclean hands.

■ Under the unclean hands doctrine, "a party engaging in improper or fraudulent conduct relating in some significant way to the subject matter of the cause of action may be ineligible for equitable relief." *Premier Farm Credit, PCA v. W-Cattle, LLC,* 155 P.3d 504, 519 (Colo.App. 2006) (citing *Salzman v. Bachrach,* 996 P.2d 1263, 1269 (Colo.2000)). Whether the unclean hands doctrine applies is a separate inquiry from whether a party to a contract has breached the implied duty of good faith and fair dealing. Because unclean hands is a discretionary equitable matter, "it is within the trial court's discretion to determine not only whether the facts support a finding of unclean hands, but also whether to grant equitable relief based on such a finding." *Premier Farm Credit,* 155 P.3d at 520. We perceive no abuse of discretion here.

The judgment is affirmed.

Judge ROMÁN concurs.

Judge ROY dissents.

Judge ROY dissenting.

I respectfully dissent.

The pivotal issue in this case is whether the trial court has the authority to reform an option to purchase contained in a business or commercial contract under the authority granted by section 15–11–1106(2), C.R.S. 2009. The majority concludes that the statute grants that authority and I cannot agree.

The General Assembly adopted the Colorado Statutory Rule Against Perpetuities Act (the Act) in 1991, and substantially amended it in 2001. Ch. 252, sec. 9, §§ 15–11–1101 to –1107, 1991 Colo. Sess. Laws 1445–48; Colo. Sess. Laws 2001, ch. 249, sec. 4, §§ 15–11–1102(1), 2001 Colo. Sess. Laws 888. Prior to addressing its applicable provisions, I note that there are two classes of terms used throughout the Act: (1) terms describing the nature of the interests involved; and (2) terms describing the nature of the instruments or entities involved. Two terms dominate the first class; they are: "nonvested property interest" and "power of appointment." Several terms dominate the second class, which are: "trust," "trustee," "fiduciary," "beneficiaries," "distributions," "plan of distribution," "gift," and other similar terms. The Act does not define "nonvested property interest," but the term is defined in the comments to the uniform law from which it is derived. That definition is: "[a] nonvested property interest (also called a contingent interest) is a future interest in property that is subject to an unsatisfied condition precedent." 8B U.L.A. 239 (2001). Vested, in this context, means elevated to a possessory interest or the estate owned by the grantor. The use of these terms, without more, and without any term consistent with commercial transactions, would lead one, as it does me, to conclude that the Act's scope is limited to wills, trusts, and similar instruments. In addition, though it is not of great import, the Act is included in Title 15, Article 11, which are the statutes of wills and intestate succession. *See People v. Borghesi,* 66 P.3d 93 (Colo.2003) (placement in the statutes is frequently done by revisor of statutes).

The common law rule against perpetuities "invalidates interests limited to vest upon events not certain to occur within 21 years of some life in being at the creation of the interest." *Rocky Mountain Fuel Co. v. Hef-*

*lin,* 148 Colo. 415, 421, 366 P.2d 577, 580 (1961). The statutory rule against perpetuities has been twice formulated. The 1991 formulation applies to interests in trusts and powers of appointment created after May 31, 1991, and, as pertinent here, states: "A nonvested property interest *is invalid* unless: (A) [w]hen the interest is created, it is certain to vest or terminate no later than twenty-one years after the death of an individual who is then alive; or (B) [t]he interest either vests or terminates within ninety years after its creation." § 15–11–1102.5(2)(b)(I)(A)–(B), C.R.S.2009 (emphasis added). The 2001 statutory formulation applies to interests in trusts and powers of appointment with respect to all or any part of a trust created after May 31, 2001, and states, in pertinent part: "A nonvested property interest *is invalid* unless it either vests or terminates within one thousand years after its creation." § 15–11–1102.5(1)(a), (b)(I), C.R.S.2009 (emphasis added). Both formulations exclude commercial transactions because they are limited to interests in trusts and powers of appointment. Further, commercial transactions are expressly excluded from the statutory rule against perpetuities, with numerous exceptions not pertinent here, by section 15–11–1105(1)(a), C.R.S.2009, which states: "The statutory rule ... does not apply to invalidate ... [a] nonvested property interest or a power of appointment arising out of a *nondonative* transfer...." (Emphasis added.)

In my view, the explicit exclusion of nondonative transactions from the scope of the Act; the use of donative terms throughout the Act, to the exclusion of commercial transaction terms, to describe, and in my view circumscribe, the nature of the instruments and transfers governed by the Act; and, to a considerably lesser extent, the placement of the Act in the probate article of the statutes demonstrate the limited scope of the Act and it does not authorize the court to reform a commercial instrument. *See People v. Tixier,* 207 P.3d 844, 847 (Colo.App.2008) ("We read the statute as a whole 'to give "consistent, harmonious and sensible effect to all its parts," ' [presuming] that the legislature intended the entire statute to be effective.... [Further] [w]e avoid [statutory] constructions that are at odds with the legislative scheme."

(quoting *Colo. Water Conservation Bd. v. Upper Gunnison River Water Conservancy Dist.,* 109 P.3d 585, 593 (Colo.2005))).

Despite the explicit and implicit limitations on the scope of the Act, the majority concludes that section 15–11–1106(2), grants courts authority to reform pre–1991 commercial instruments which create invalid future interests because of a violation of the common law rule against perpetuities. That section provides:

> If a nonvested property interest or a power of appointment was created before May 31, 1991, and is determined in a judicial proceeding, commenced on or after May 31, 1991, to violate this state's rule against perpetuities as that rule existed before May 31, 1991, a court upon the petition of an interested person shall reform the disposition by inserting a savings clause *that preserves most closely the transferor's manifested plan of distribution and that brings that plan within the limits of the rule against perpetuities applicable when the nonvested property interest or power of appointment was created.*

§ 15–11–1106(2) (emphasis added).

In my view, based on my conclusion that the scope of the Act is limited, I can conceive of no reason why one provision of the Act should have broader application than the Act itself, especially when, as here, that provision is itself self-limiting by requiring that the permitted reformation *"preserve most closely the transferor's manifested plan of distribution,"* § 15–11–1106(2) (emphasis added), a phrase closely associated with donative, not commercial, instruments both within and without the Act.

I would reverse the trial court's judgment and remand with directions to enter judgment for ARCO.