2014 CO 16

**ATLANTIC RICHFIELD COMPANY,**
Petitioner,

v.

**WHITING OIL AND GAS CORPORA-TION, f/k/a Equity Oil Company,**
Respondent.

**Supreme Court Case No. 10SC688**

Supreme Court of Colorado.

March 3, 2014

Attorneys for Petitioner: Davis Graham & Stubbs, LLP, Shannon Wells Stevenson, Elizabeth H. Titus, Denver, Colorado.

Attorneys for Respondent: Welborn Sullivan Meck & Tooley, PC, Kathryn Haight Keith D. Tooley, Denver, Colorado.

Attorneys for Amicus Curiae Colorado Bar Association: Benjamin, Bain, Howard & Cohen, LLC, James W. Bain, Greenwood Village, Colorado, The Sweetser Law Firm, P.C. Daniel A. Sweetser, Denver, Colorado.

JUSTICE MÁRQUEZ delivered the Opinion of the Court

¶ 1 We granted certiorari review to address a doctrine that has been described as "long cherished by law school professors and dreaded by most law students: the infamous rule against perpetuities." *Byke Constr. Co. v. Miller,* 140 Ariz. 57, 680 P.2d 193, 194 (Ct.App.1984). Specifically, we have been asked to determine whether section 15–11– 1106(2), C.R.S. (2013), which provides for reformation of nonvested property interests to avoid the harsh consequences of the common law rule against perpetuities, requires a court to reform a revocable option negotiated as part of a commercial contract entered into before May 31, 1991 (the effective date of the Statutory Rule Against Perpetuities Act).

¶ 2 The common law rule against perpetuities was developed to curb excessive "dead-hand control" of property retained in families through intergenerational transfers. Restatement (Third) of Prop.: Servitudes § 3.3 cmt. b (2000); 2A Cathy Stricklin Krendl et al., *Colo. Prac., Methods of Practice* 214 (6th ed. 2012). Like rules against restraints on alienation, the rule against perpetuities stems from a general policy that frowns upon the withdrawal of property from commerce. *See Atchison v. City of Englewood,* 170 Colo. 295, 306, 463 P.2d 297, 302 (1969). The rule against perpetuities furthered this policy by voiding property interests that may vest too remotely. Under the common law rule, a non-vested property interest is void unless it is certain to vest, if at all, within twenty-one years after the death of a life in being at the time the interest was created. *See Cambridge Co. v. E. Slope Inv. Corp.,* 700 P.2d 537, 539 (Colo.1985).

¶ 3 At issue here is section 15–11–1106(2), which appears in the Statutory Rule Against Perpetuities Act ("Act"). *See* §§ 15–11–1101 to –1216, C.R.S. (2013). In Colorado, the Act—which was modeled on the Uniform Statutory Rule Against Perpetuities ("USRAP")[1]—supersedes the common law rule for nonvested property interests created after May 31, 1991. § 15–11–1107(2), C.R.S. (2013). The common law rule still applies to nonvested property interests created prior to that date. *Id.* Under the Act, all donative transfers created after May 31, 1991 (with the exception of trusts and powers of appointment)[2] are valid so long as the property

---

1. The National Conference of Commissioners on Uniform State Laws drafted the Uniform Statutory Rule Against Perpetuities ("USRAP") as a model act, with the express purpose of eliminating the application of the common law rule going forward. Unif. Statutory Rule Against Perpetuities Act § 4 (amended 1990), 8B U.L.A. 223–92 (2001).

2. Trusts and powers of appointment created after May 31, 1991 are valid so long as the property interest vests or terminates within 1,000 years of its creation. *See* § 15–11–1102.5(1)(a)–(b), C.R.S. (2013).

interest created vests or terminates within ninety years of its creation. § 15–11–1102.5, C.R.S. (2013). The statutory rule thus adopts a "wait and see" approach under which no interest is invalid unless and until it actually fails to vest within the statutory period.

¶ 4 Section 15–11–1106(2) of the Act is a reformation provision that requires courts, upon request, to reform nonvested interests created prior to May 31, 1991 to bring them into compliance with the common law rule. The parties before us dispute whether section 15–11–1106(2) applies broadly to permit reformation of all nonvested property interests that predate the Act, or whether it applies more narrowly to reform only the types of nonvested interests that remain subject to the statutory rule against perpetuities, thus precluding reformation of the commercial option at issue here. Regardless of the breadth of interests potentially subject to reformation, section 15–11–1106(2) applies only to reform interests that are determined in a judicial proceeding to "violate this state's rule against perpetuities as that rule existed before May 31, 1991."

¶ 5 In this case, the trial court concluded that the revocable option at issue here, granted as part of a negotiated commercial agreement, violated the common law rule against perpetuities. Pursuant to section 15–11–1106(2), the court inserted a savings clause to prevent the option from being voided by the common law rule and ruled that the option holder was entitled to specific performance of the reformed option. The court of appeals affirmed the trial court judgment, concluding that the trial court properly applied section 15–11–1106(2) to reform the option. *Whiting Oil & Gas Co. v. Atlantic Richfield Co.*, 321 P.3d 500, 505–06, 2010 WL 3432211, at *4–5 (Colo.App. No. 09CA1081, Sept. 2, 2010). In so doing, the court of appeals expressly declined to reach the question of whether the revocable option was subject to the common law rule. *Id.* at 505, 2010 WL 3432211 at *4.

¶ 6 We granted review to examine whether section 15–11–1106(2) authorized the trial court to reform the option at issue here. In so doing, we consider, as a threshold matter, whether the option violated the common law rule, and conclude that it did not. The commercial option negotiated by the parties posed no practical restraint on alienation because it was fully revocable at any time before its exercise. Therefore, the option did not violate the common law rule against perpetuities as that rule was construed in our case law prior to passage of the Act. Because the option here did not violate the common law rule against perpetuities, it was valid as originally negotiated by the parties and no reformation was necessary. Accordingly, we affirm the judgment of the court of appeals on different grounds and do not reach the Petitioner's arguments that section 15–11–1106(2) does not provide for the reformation of nondonative, commercial instruments, or that the lower courts' application of that section to the option here was unconstitutionally retrospective.

## I.

¶ 7 Beginning in 1968, Petitioner Atlantic Richfield Company ("ARCO") and Respondent Equity Oil Company (now known as Whiting Oil & Gas) ("Equity") entered into a series of agreements to develop oil shale on a number of properties, including a property in western Colorado known as the Boies Block. An option contained within one of these agreements is the source of the current controversy.

## A.

¶ 8 In 1968, ARCO and Equity entered into an agreement ("1968 Agreement") in which ARCO committed two million dollars to fund Equity's research into methods of recovering oil shale from several properties. In return, Equity conveyed a partial interest in the properties to ARCO, thereby allowing ARCO to share in any future profits from oil shale production. Specifically, and as relevant here, Equity conveyed half of its undivided fifty-percent interest in the Boies Block to ARCO. The 1968 Agreement further provided that if oil shale was not in commercial production by 1983, Equity would convey an additional interest in the Boies Block to ARCO ("Additional Conveyance").

¶ 9 By 1982, Equity's research had not led to commercial production of oil shale. In 1983, following a year of negotiations, ARCO and Equity agreed to an amendment postponing the Additional Conveyance. That 1983 amendment is at issue here. As an incentive to complete its research, ARCO granted Equity a non-exclusive option ("1983 option") to buy back the interest in the Boies Block that ARCO had previously acquired from Equity as part of the 1968 Agreement. Pursuant to the 1983 amendment, Equity's right to exercise the option would not expire until 11:59 p.m. on February 1, 2008. Importantly, the parties agreed that "ARCO shall retain the sole and exclusive right to cancel this Option at any time during its term," with the exception that Equity was granted a right of first refusal if ARCO received an offer from another party to buy its interest in the Boies Block.[3] The parties' agreement set an initial price at which the 1983 option could be exercised, but provided for annual market-based adjustments tethered to the annual percentage change in ARCO's published benchmark price for West Texas sour crude oil.

¶ 10 Equity's research never led to commercial production of oil shale from the properties. In the early 2000s, Equity sought to acquire ARCO's interest in the Boies Block after discovering that the property contained valuable reserves of natural gas. In 2003, ARCO rejected an initial offer by Equity to purchase the Boies Block for $10,000, but took no action to revoke the 1983 option. Then, in 2006, Equity attempted to exercise the 1983 option. The 1983 option had not considered natural gas production in its exercise price valuation, instead tying the exercise price to ARCO's West Texas sour crude benchmark. When Equity attempted to exercise the option in 2006, the purchase price for the property—as determined by the option's valuation formula[4]—was significantly below the property's 2006 market value. ARCO refused to convey the interest in the Boies Block to Equity.

B.

¶ 11 Equity sued ARCO for specific performance of the 1983 option. ARCO moved for judgment on the pleadings, arguing that, as a matter of law, the 1983 option was void ab initio because the twenty-five year option period violated the common law rule against perpetuities. In response, Equity argued that the common law rule against perpetuities does not apply to cancelable or revocable interests. Equity argued that because the 1983 option could be cancelled at ARCO's sole and exclusive discretion, the option imposed no practical restraint on ARCO's property interests and did not violate the policies of the common law rule. Alternatively, Equity argued that even if the 1983 option violated the common law rule, the court was required to reform the option by inserting a savings clause pursuant to section 15–11–1106(2).

¶ 12 The trial court denied ARCO's motion for judgment on the pleadings. The court agreed with ARCO that the twenty-five year option, as written, violated the common law rule against perpetuities because it could be exercised more than twenty-one years after the parties entered into the 1983 amendment. However, the court denied judgment on the pleadings because the option could be reformed under section 15–11–1106(2).

¶ 13 Following a bench trial on the remaining issues in the case, the court reformed the option pursuant to section 15–11–1106(2) by inserting a savings clause terminating the option "unless it is exercised no later than twenty-one years after the death of [former Equity president] Paul M. Dougan." The trial court concluded that Equity was entitled to specific performance of the reformed option, and imposed a constructive trust on ARCO's interest in the Boies Block until ARCO delivered the deed required by the court's judgment.

¶ 14 In a 2–1 decision, the court of appeals affirmed the trial court's judgment, rejecting

---

3. The right of first refusal allowed Equity to purchase the property at the same price, and under the same terms as offered by a third party.

4. ARCO stopped publishing the West Texas sour crude benchmark price in July 2000. In exercising the option in 2006, Equity tendered payment of an option price based on its own determination of a substitute for the benchmark price.

ARCO's argument that the reformation provision does not apply to commercial, nondonative transfers. *Whiting Oil & Gas Corp. v. Atlantic Richfield Co.*, 321 P.3d 500, 505–08, 2010 WL 3432211, at *4–7 (Colo.App. No. 09CA1081, Sept. 2, 2010). The majority also rejected ARCO's argument that the trial court's reformation of the 1983 option constituted an unconstitutional retrospective application of section 15–11–1106(2). *Id.* at 507–09, 2010 WL 3432211 at *7–8.

¶ 15 The majority reasoned that, by its own terms, section 15–11–1106(2) applies to "nonvested property interests" and does not exclude interests arising from nondonative transfers. *Id.* at 506, 2010 WL 3432211 at *5. The majority noted that some versions of the USRAP adopted in other states expressly exclude interests arising from nondonative transfers from the operation of the entire act, including the reformation provision, and not just from the vesting requirements of the new statutory rule. *Id.* Accordingly, those states' reformation provisions generally would not apply to commercial transactions. *Id.* In contrast, Colorado's version of the USRAP contains a narrower exclusion of such interests, exempting them only from the *vesting* requirements of the statutory rule against perpetuities. Thus, the majority reasoned, the general assembly did not intend to exclude such interests from application of the *reformation* provision in section 15–11–1106(2). *Id.* at 506–07, 2010 WL 3432211 at *6.

¶ 16 The majority further reasoned that applying the reformation provision broadly to all interests invalidated under the common law rule comports with the legislature's "major policy goal" to "make interests valid whenever possible." *Id.* Finally, the majority held that application of section 15–11–1106(2) to the 1983 option was not unconstitutionally retrospective because it did not take away or impair a vested interest, create a new obligation or duty, or attach a new disability. The court reasoned that ARCO

could not claim a vested interest in the non-enforcement of its contractual agreement; therefore, the reformation provision served a remedial purpose that did not take away from or otherwise impair ARCO's vested interests. *Id.* at 507–09, 2010 WL 3432211 at *7–8. Because it concluded that the trial court properly applied the reformation provision, the court of appeals expressly declined to address Equity's argument that it should affirm the trial court on the grounds that the 1983 option did not violate the common law rule against perpetuities because ARCO could cancel the option at any time. *Id.* at 505, 2010 WL 3432211 at *4.

¶ 17 In dissent, Judge Roy noted that the Act, which is located in the article of the Colorado Probate Code addressing intestate succession and wills, uses terminology associated with donative instruments, such as "trust," "trustee," "fiduciary," "beneficiaries," "distributions," "gift," and other similar terms. *Id.* at 509, 2010 WL 3432211 at *9 (Roy, J., dissenting). The use of these terms, coupled with the absence of any term consistent with commercial transactions, led Judge Roy to conclude that the scope of the Act "is limited to wills, trusts, and similar instruments." *Id.* at 509, 2010 WL 3432211 at *10. Judge Roy reasoned that because the Act itself applies only to donative transfers, it would be illogical to construe the reformation provision in section 15–11–1106(2) to apply more broadly than the rest of the Act itself. *Id.*

¶ 18 ARCO petitioned this court to review the court of appeals' decision, and we granted certiorari review.[5] We affirm, albeit on different grounds.

## II.

¶ 19 Because section 15–11–1106(2) applies to reform only nonvested interests that violate the common law rule against perpetuities, we first determine, as a thresh-

---

5. This court granted certiorari review of the following issues:
   1. Whether the Statutory Rule against Perpetuities Act's reformation provision, section 15–11–1106(2), C.R.S. (2009), authorizes a court to reform a non-donative, commercial option created prior to the effective date of the Act

in order to bring it into compliance with the common law rule against perpetuities.
   2. Whether the reformation provision is unconstitutionally retrospective, where such reformation deprives a party of its vested interest in real property.

old matter, whether the 1983 option violated the common law rule.[6]

¶ 20 We first review the origins and development of the common law rule and the commentary criticizing its application to commercial instruments. In so doing, we acknowledge that the vesting period of the common law rule, based on lives in being plus twenty-one years, makes little sense in the world of commercial transactions. Indeed, for this reason, nonvested interests arising out of commercial transactions are now excluded from the vesting requirements of the statutory rule. Many courts, including our own, have struggled with the application of the common law rule to commercial transactions. Over time, we have avoided applying the rule against perpetuities to certain types of interests in commercial settings where we have concluded that the purposes of the common law rule would not be advanced. *See Cambridge Co. v. E. Slope Inv. Corp.,* 700 P.2d 537, 541 (Colo.1985). Upon reexamination of our more recent cases involving nondonative, commercial transactions, we conclude that we effectively have been applying a general rule against unreasonable restraints on alienation, rather than the rule against perpetuities in its classic formulation. The current Restatement (Third) of Property acknowledges this modern trend in the treatment of options and preemptive rights such as rights of first refusal. Restatement (Third) of Prop.: Servitudes § 3.3 (2000).

¶ 21 Turning to this case, we conclude that the 1983 option posed no practical restraint on alienation because ARCO retained the power to cancel the option at any time before its exercise. Because it was fully revocable, the option did not violate the common law rule against perpetuities, either as construed in our case law prior to passage of the Act, or even as strictly formulated. Accordingly, we hold that the 1983 option was valid as originally negotiated by the parties and no refor-

mation was necessary. We therefore affirm the judgment of the court of appeals on different grounds and do not reach ARCO's arguments that section 15–11–1106(2) does not apply to reform nondonative, commercial instruments, or that the lower courts' application of that section to the option here was unconstitutionally retrospective.

### A.

⬛ ¶ 22 Whether a property interest violates either the common law rule against perpetuities or the rule against unreasonable restraints is a mixed question of law and fact. "A mixed question of law and fact involves the application of a legal standard to a particular set of evidentiary facts in resolving a legal issue." *Mt. Emmons Mineral Co. v. Town of Crested Butte,* 690 P.2d 231, 239 (Colo.1984). Here, the parties do not dispute the terms of the 1983 amendment; rather, they disagree about the legal effect of those terms. It is well established that "[w]hen the controlling facts are undisputed ... the legal effect of those facts constitutes a question of law." *Turbyne v. People,* 151 P.3d 563, 572 (Colo.2007). Because the undisputed terms of the 1983 amendment control, we review the legal impact of those terms de novo.

### B.

¶ 23 The common law rule against perpetuities arose in England in response to landowners' attempts to control their land in perpetuity. 3 *Thompson on Real Property,* 618 (David A. Thomas ed., 3d ed Lexis Nexis 2012). The English courts, having deemed it generally good policy to keep property marketable by limiting restraints on its alienation, developed the rule against perpetuities to "curb excessive dead-hand control of property retained in families through intergenerational transfers." Restatement (Third) of Prop.: Servitudes § 3.3 cmt. b (2000). The

---

6. We disagree with ARCO's contention that this court cannot consider the applicability of the common law rule to the 1983 option because Equity did not cross-petition on the issue. "It is settled law that a respondent may defend the judgment of the trial court or the court of appeals on any ground supported by the record, so long as the party's rights are not increased under

the judgment." *Farmers Grp., Inc. v. Williams,* 805 P.2d 419, 428 (Colo.1991). In any event, we must consider whether the 1983 option violated the common law rule because it is a threshold question in determining whether that option was subject to reformation under section 15–11–1106(2).

rule served to "avoid fettering real property with future interests dependent upon contingencies unduly remote which isolate the property and exclude it from commerce and development for long periods of time, thus working an indirect restraint upon alienation." *First Nat'l Bank & Trust Co. v. Sidwell Corp.,* 234 Kan. 867, 678 P.2d 118, 127 (1984) (quoting *Weber v. Texas Co.,* 83 F.2d 807, 808 (5th Cir.1936)). Like rules against unreasonable restraints on alienation, the rule against perpetuities stems from a general policy against withdrawal of property from commerce, and accordingly aims to keep property freely transferable. *See Atchison v. City of Englewood,* 170 Colo. 295, 305, 463 P.2d 297, 302 (1969); *see also* W. Barton Leach, *Perpetuities in a Nutshell,* 51 Harv. L.Rev. 638, 640 (1938).

¶ 24 The rules against unreasonable restraints on alienation generally aim to keep assets available for commerce by applying different types of limits depending on the nature of the property, the purpose of the restraint, and its potential for harm. Restatement (Third) of Prop.: Servitudes § 3.4 cmt. a (2000). The rule against unreasonable restraints "is applied by considering the reasonableness of the restraint." *Metro. Transp. Auth. v. Bruken Realty Corp.,* 67 N.Y.2d 156, 501 N.Y.S.2d 306, 492 N.E.2d 379, 381 (1986). "Determining reasonableness of a restraint on alienation requires balancing the utility of the purpose served by the restraint against the harm that is likely to flow from its enforcement." Restatement (Third) of Prop.: Servitudes § 3.4 cmt. c (2000). In making such a determination, courts must evaluate the "nature, extent, and duration of the restraint," as well as the "nature of the property interest and the type of land or development involved." *Id.* This flexible analysis is equally applicable to both commercial transactions in property as well as to donative transfers. *Id.*

¶ 25 By contrast, the rule against perpetuities evolved more specifically as a limitation on family gift transactions; that is, the rule developed to address indirect restraints on alienation placed on real property by landowners seeking to preserve their land for their lineal descendants. The rule accomplished this by voiding contingent future interests that may vest too remotely in time. Under Professor Gray's classic distillation of the common law rule, which has been generally adopted in Colorado, "[n]o interest is good unless it must vest, if at all, not later than twenty-one years after some life in being at the creation of the interest." John Chipman Gray, *The Rule Against Perpetuities* 191 (Roland Gray ed., 4th ed. 1942); *Cambridge,* 700 P.2d at 539 (quoting *Crossroads Shopping Ctr. v. Montgomery Ward & Co.,* 646 P.2d 330, 332 (Colo.1981)). Importantly, because the rule developed to address concerns regarding excessively long family settlements, the perpetuities period—twenty one years after some life in being at the creation of the interest—was tailored to fit the needs of family gift transactions. W. Barton Leach, *Perpetuities in Perspective: Ending the Rule's Reign of Terror,* 65 Harv. L.Rev. 721, 737 (1952). This court first recognized and applied the common law rule against perpetuities in 1896. *See Chilcott v. Hart,* 23 Colo. 40, 54, 45 P. 391, 396 (1896).

¶ 26 In the late 19th century, courts began to view the rule against perpetuities as a generalized statement purporting to apply to all contingent interests in property, and therefore began to apply the rule to commercial land transactions, including, among other things, options and rights of first refusal. Restatement (Third) of Prop.: Servitudes § 3.3 cmt. b (2000). The line of case law applying the rule to options generally can be traced back to the 1882 English case of *London & S.W. Ry. Co. v. Gomm,* 20 Ch. 562 (1882). *See, e.g., Rocky Mountain Fuel Co. v. Heflin,* 148 Colo. 415, 421, 366 P.2d 577, 580 (1961) (citing *London & S.W. Ry. Co.* for the proposition that options to purchase real estate are subject to the rule against perpetuities); 3 Lewis M. Simes & Alan F. Smith, *The Law of Future Interests* 204 (John A. Borron, Jr. ed., 3d ed. 2004); Leach, *Perpetuities in Perspective, supra* at 736 n. 29. Courts reasoned that because an option to purchase land is specifically enforceable, the option holder has an equitable interest in the land that is contingent upon the exercise of the option. *See* Leach, *Perpetuities in Perspective, supra* at 736–37. Reasoning that contingent interests in land are void unless

they must vest within the period of perpetuities, courts concluded that an option to purchase that can be exercised beyond the period of perpetuities is void under the rule. *Id.*

¶ 27 The application of the common law rule to nondonative, commercial transactions has been sharply criticized. For well over half a century, commentators have argued that the rule against perpetuities should not be applied to commercial transactions. These commentators have contended that, even assuming it is desirable to impose some sort of restriction on the equitable interests created by specifically enforceable contracts, the perpetuities period of the common law rule does not offer an appropriate limitation: "lives in being" and "21 years" have "no significance in the world of commercial affairs." Leach, *Perpetuities in a Nutshell, supra* at 661; *see also* Lewis M. Simes & Alan F. Smith, *The Law of Future Interests* 159 (Alan F. Smith ed., 2d ed. 1956) ("[T]he rule against perpetuities was designed primarily to restrict family settlements and not commercial transactions, and ... an option to purchase land is nearly always a part of a commercial transaction. As an original proposition, it might have been better for the courts to hold that all option contracts are outside the rule against perpetuities."); T. Bergin et al., *Preface to Estates in Land & Future Interest* 207–08 (2d ed. 1984) ("[T]he rule against perpetuities is obviously not suited to the commercial transaction.").

¶ 28 The Restatement (Third) of Property, which now states that the rule against perpetuities does not apply to options and rights of first refusal with respect to the purchase of land, notes that the problem with applying the rule in this context is that "it operated arbitrarily, applying a time period totally unsuited to commercial transactions. Lives in being plus 21 years is too long for some servitude arrangements and irrational in others." Restatement (Third) of Prop.: Servitudes § 3.3 cmt. b (2000).

¶ 29 Although courts have been slow to react to this criticism, some have recognized the problems of subjecting commercial transactions to the rule. In *Shaver v. Clanton,* the California Court of Appeal stated that "[i]t makes no sense to apply a rule based on

family-oriented donative transfers to interests created by contract." 26 Cal.App.4th 568, 31 Cal.Rptr.2d 595, 598 (1994) (citation omitted). Similarly, in *Pathmark Stores, Inc. v. 3821 Associates, L.P.,* the Delaware Court of Chancery noted that because the common law rule against perpetuities' time period "is tied to notions of when a person will attain the age of majority," it is inapplicable to commercial transactions that "have absolutely no tie to either lives in being or twenty-one years." 663 A.2d 1189, 1193 (Del. Ch.1995).

¶ 30 In recent years, some courts have adopted the Restatement's view that both commercial options and rights of first refusal fall beyond the ambit of the common law rule against perpetuities. *See, e.g., Bauermeister v. Waste Mgmt. Co.,* 280 Neb. 1, 783 N.W.2d 594, 600 (2010) (holding that the rule against perpetuities is inapplicable to a contractual option); *Old Port Cove Holdings, Inc. v. Old Port Cove Condo. Assoc. One, Inc.,* 986 So.2d 1279, 1287–88 (Fla.2008) (adopting the "modern" view that options and rights of first refusal should be "analyzed under the rule against unreasonable restraints ... [and] are not subject to the common law rule against perpetuities") (citing Jesse Dukeminier, *A Modern Guide to Perpetuities,* 74 Cal. L.Rev. 1867, 1908 (1986) ("The modern trend, however, has been to free preemptive options from the Rule and to subject them instead to the rule against unreasonable restraints on alienation.")); *Shaver,* 31 Cal.Rptr.2d at 598 (observing that "the purpose of the rule against perpetuities was found to be inapt to commercial arrangements").

¶ 31 Courts adopting the Restatement approach observe that neither the historical purpose of the rule against perpetuities, nor public policy, is served by applying the rule to commercial transactions. In *Bauermeister,* the Nebraska Supreme Court held:

It would be inequitable to declare this option void ab initio. Two commercial entities have bargained for the option to repurchase, each presumably gaining and losing contractual advantages during the negotiation process to reach this agreement.... Allowing defendants to escape the terms of the contract because [plain-

tiff] *might* exercise the option in an unreasonably remote way defies the contract's terms, logic, common sense, public policy, and principles of equity.

783 N.W.2d at 600 (quoting *Pathmark Stores, Inc.*, 663 A.2d at 1193).

¶ 32 In line with the longstanding commentary criticizing application of the common law rule to commercial transactions, the Uniform Law Commissioners exempted from the US-RAP all nonvested property interests and powers of appointment arising out of nondonative transfers. Unif. Statutory Rule Against Perpetuities § 4 (amended 1990), 8B U.L.A. 279 (2001). The Commissioners' rationale for excluding property interests that are created through a "nondonative, commercial-type transaction" is that the rule against perpetuities "is a wholly inappropriate instrument of social policy to use as a control over such arrangements." *Id.* at 280 cmt. A.

¶ 33 Colorado's Statutory Rule Against Perpetuities Act was adopted by the legislature in 1991, and is modeled on the USRAP. The Act expressly "supersedes and abolishes" the common law rule and establishes a new statutory rule for nonvested interests created after May 31, 1991. § 15–11–1107(2), C.R.S. (2013); *Argus Real Estate, Inc. v. E-470 Pub. Highway Auth.*, 109 P.3d 604, 610 (Colo.2005). Like the USRAP, Colorado's statutory rule against perpetuities excludes nonvested property interests and powers of appointment arising out of nondonative transfers. § 15–11–1105(1)(a), C.R.S. (2013).[7] That is, the Act effectively exempts arms-length commercial transactions from the common law rule's vesting requirements; the statutory rule does not apply, for example, to options or preemptive rights in the nature of a right of first refusal, except to the extent they are created in the context of a gift or other "donative" transfer. *See* Krendl, *supra* at 215.

### C.

¶ 34 We recognize that our court has struggled with the application of the common law rule against perpetuities in the commercial arena, which has led to a convoluted and imprecise body of case law. This court has stated, without analysis, that the application of the common law rule to "ordinary options" is "firmly established," *Atchison*, 170 Colo. at 306, 463 P.2d at 302, and that the "rule applies to both options and preemptive rights," *Perry v. Brundage*, 200 Colo. 229, 234, 614 P.2d 362, 366 (1980). Close review of our cases addressing options and preemptive rights, however, reveals that in our struggle to apply the rule against perpetuities to commercial instruments, we have blurred the distinction between the common law rule against perpetuities and the rule against unreasonable restraints on alienation. We have declared that we will apply the rule against perpetuities only where the "purposes" of the rule are served, such as preventing a practical restraint on alienation or encouraging improvement of the property. *See Cambridge Co.*, 700 P.2d at 541. Yet in so doing, we have effectively shifted the inquiry to the reasonableness of the restraint and away from a strict application of the rule focused on the remoteness of vesting.

¶ 35 This trend in our case law reaches back forty years to *Atchison v. City of Englewood*, 170 Colo. 295, 463 P.2d 297 (1969). In *Atchison*, the plaintiffs sold land to the City of Englewood, but retained a preemptive right to repurchase the land at the same price and terms as the City might be willing to sell it to a third party. *Id.* at 299, 463 P.2d at 298. The preemptive right to repurchase contained no expiration date, and specified that the "terms and provisions hereof shall inure to the benefit of the heirs, legal representatives and assigns of the [plaintiffs]." *Id.* at 301, 463 P.2d at 299. After determining that the preemptive right was unlimited in duration, we observed that "at some point in the infinite time at which En-

---

**7.** Like section 4 of the USRAP, section 15–11–1105(1)(a)(I) specifies certain nondonative transactions in the domestic arena that are governed by the new statutory rule. These include pre- or post-marital agreements, separation or divorce settlements, and contracts to make or not revoke a will, among other things. Unif. Statutory Rule Against Perpetuities § 4 (amended 1990), 8B U.L.A. 279 cmt. A (2001); *see also* Wayne Gazur, *Colorado Revisits the Rule Against Perpetuities*, 35 Colo. Law. 75, 76 (2006).

glewood might in the future conclude to sell the land, ascertaining and locating the owners of the pre-emptive right would be an unreasonable task." *Id.* at 308, 463 P.2d at 303. Concerned with the practical implications of enforcing such a right in the distant future, we voided the preemptive right, concluding that it violated the common law rule against perpetuities. *Id.* at 308, 463 P.2d at 303.

¶ 36 We recognized in *Atchison* that "there is a difference between the rule against perpetuities and the rule against restraints upon alienation," namely, that "[t]he rule against perpetuities invalidates interests which vest too remotely," while "[t]he rule against restraints upon alienation relates to other unreasonable restraints." *Id.* at 305, 463 P.2d at 301. Nonetheless, we held that the preemptive right at issue acted as an "unreasonable restraint upon the transferability of the property as to justify imposition of the rule against perpetuities." *Id.* at 308, 463 P.2d at 303. In so holding, we admitted that "[i]t may be said that we are stating a rule against alienation and giving it a label of the rule against perpetuities. Be that as it may, the result is the same." *Id.* at 308, 463 P.2d at 303.

¶ 37 Put differently, we effectively conceded in *Atchison* that we were voiding the preemptive right not because it could be exercised after the expiration of a life in being plus twenty-one years, but because we concluded that its infinite duration was unreasonable, particularly given the difficulty of locating a future holder of the preemptive right. *Id.* at 308, 463 P.2d at 303. In so doing, we stated that the preemptive right was void because it violated the rule against perpetuities, when, in actuality, our concern was grounded in the unreasonableness of the restraint. This imprecision was inconsequential to the outcome in *Atchison;* however, in hindsight, our approach gave rise to a confusing line of cases. By nominally applying the rule against perpetuities to a preemptive right when our true concern was the unreasonableness of the restraint, we perpetuated the notion that the rule against perpetuities properly applies to arms-length commercial transactions, even though we ac-

knowledged that commentary at the time argued against such an application. *Id.* at 306, 463 P.2d at 302 (noting debate and arguments by the American Law of Property at the time that "the rule should not apply and that non-application is the modern trend").

¶ 38 A decade later in *Perry,* we omitted any discussion of the rule against unreasonable restraints, and citing to *Atchison,* summarily stated that the rule against perpetuities "applies to both options and preemptive rights, whether in the grantor or third persons." 200 Colo. at 234, 614 P.2d at 366.

¶ 39 We later acknowledged in *Crossroads Shopping Center v. Montgomery Ward & Co., Inc.,* 646 P.2d 330, 332 (Colo.1981), that not all options are subject to the rule against perpetuities. For example, we observed that the rule does not apply where a lessee has an option to purchase the leased property, or to extend the lease for an additional period. *Id.* However, we did apply the rule to the option at issue in that case, which permitted the lessee to acquire additional premises. *Id.* We noted that such an option might cause the lessor to hesitate to improve the property, knowing that the lessee might exercise the option. *Id.* Thus, we concluded, a "fundamental purpose" of the rule against perpetuities applied, "and consequently, so ought the rule." *Id.*

¶ 40 A few years later, we again turned to the "purposes" of the rule when we were asked to void a "right of preemption" in a condominium declaration that gave individual condominium owners a first right to purchase any other unit offered for sale, upon the same terms and conditions offered by a third party buyer. *Cambridge,* 700 P.2d at 538. In that case, we acknowledged that a right of preemption "traditionally has been viewed as a contingent equitable interest in real property subject to the rule against perpetuities." *Id.* at 540. Therefore, we acknowledged, "we have held that the rule 'applies' to preemptive rights." *Id.* (citing *Perry,* 200 Colo. at 234, 614 P.2d at 366). We further acknowledged that "[a] technical application of the rule against perpetuities in this case would void the preemptive right at issue," because under the terms of the declaration, the preemptive right could be exercised by

"grantees, successors, heirs, executors, administrators, devisees or assigns" of the unit owners—meaning that the right conceivably could be exercised more than twenty-one years beyond the period of all lives in being relevant to the condominium declaration. *Id.*

¶ 41 We did not question the propriety of applying the vesting requirements of the rule against perpetuities to commercial agreements, but instead adopted an approach that looks to whether the "purposes" of the rule against perpetuities would be served by its application. Although we acknowledged that the interest created by the right of preemption in that case would be void under a mechanical application of the rule, we declared that "the rule against perpetuities is not merely a technical rule to be mechanically applied." *Id.* We reasoned that the rule against perpetuities was created by judges to serve important considerations of public policy, and therefore should be applied with those policies in mind. *Id.*

¶ 42 We acknowledged that, as a policy matter, courts have looked with disfavor on remotely vesting contingent interests because of the likelihood that such interests create indirect restraints on the alienability of property that can lower market value and deter a present owner from making valuable improvements. *Id.* We therefore concluded that the lesson to be drawn from *Atchison* was that the rule against perpetuities will be applied to preemptive rights "only where the purposes of the rule, such as preventing a practical restraint upon alienation or encouraging improvement of the property, are served." *Id.* at 541 (citing *Crossroads Shopping Ctr.*, 646 P.2d at 332).

¶ 43 We then observed that, unlike an option that gives the holder the power to force a sale, the preemptive right at issue in *Cambridge* could not be exercised unless the owner first desired to sell; thus, the only effect of the preemption, if exercised, would be to change the identity of the buyer. *Id.* at 541–42. Because such a preemptive right posed no threat to the free alienability of the condominium units, "we perceive[d] no reason to invalidate the right under the rule against perpetuities." *Id.* at 542. Importantly, as in *Atchison,* our resolution focused on whether

the interest posed an unreasonable restraint on alienation—and not on the potential remoteness of vesting. Without directly saying so, our cases intuited that the perpetuities period of lives in being plus twenty-one years had little relevance in the commercial arena; rather, our focus remained on whether the interest at issue unreasonably impacted the free alienability of the property or threatened to deter the owner from improving the property or putting it to its highest and best use. In so doing, our cases reflect a trend noted by the Restatement (Third) of Property:

> The trend of modern decisions is to avoid applying the rule against perpetuities to commercial transactions in land by … holding that the policies behind the Rule would not be advanced by applying it to the particular transaction. The focus of discussion in most cases is the extent to which the servitude or other contingent interest will interfere with the alienability of the burdened property or with the willingness of the owner or possessor to make improvements to the property. In … permitting the social utility of the particular arrangement to avoid invalidation, courts in fact are applying the rule against unreasonable restraints on alienation rather than the rule against perpetuities.

Restatement (Third) of Prop.: Servitudes § 3.3 cmt. b (2000).

¶ 44 Certainly, any lingering debate regarding the propriety of applying the rule against perpetuities to nondonative, commercial transactions has been settled by the US-RAP and Colorado's statutory rule, at least for interests created after May 31, 1991.

### D.

¶ 45 We turn now to the 1983 option before us. Because the 1983 option was fully revocable by ARCO at any time, we conclude that it placed no practical restraint on the free alienation of ARCO's interest in the Boies Block. Accordingly, we conclude that the 1983 option does not violate the common law rule against perpetuities, either as construed in our case law prior to passage of the Act, or even as strictly formulated.

¶ 46 As discussed above, ARCO and Equity, both sophisticated commercial entities, agreed to the option as part of the 1983 amendment following a year of arms-length negotiations. Equity and ARCO were joint owners of the Boies Block at the time the 1983 amendment was negotiated. Pursuant to the 1983 amendment, the option allowed Equity to buy back the interest in the Boies Block that ARCO had previously acquired from Equity as part of the 1968 Agreement. The parties agreed that Equity could exercise the option "at any time until 11:59 p.m. on February 1, 2008, unless the Option is cancelled pursuant to the provisions hereinafter set forth." Under the terms of the agreement, ARCO retained "the sole and exclusive right to cancel this Option at any time during its term."[8]

¶ 47 Looking to whether the purposes of the common law rule are served, as we instructed in *Cambridge,* we conclude that the 1983 option did not discourage valuable improvements to the land. Equity and ARCO were joint owners of the Boies Block, and therefore the option did not discourage Equity from improving the land. At the same time, the option did not discourage ARCO from investing in the land because it faced no risk of loss, given that it could cancel the 1983 option at any time.

¶ 48 In addition, the 1983 option had a variable, market-based price term tied to the market value of sour crude oil. *See Iglehart v. Phillips,* 383 So.2d 610, 614 (Fla.1980) ("It is generally agreed that an option restraint is reasonable if the option price is at market or appraised value, irrespective of the duration of the option."). ARCO argues (in hindsight) that the price term is unreasonable because it forces ARCO to sell the Boies Block at a substantial loss. However, the question is whether the option created an unreasonable restraint on alienation discouraging a reasonable land owner from investing in improvements on the land due to an inflexible price

term. Here, the crude oil market-based price term was negotiated by two highly sophisticated parties. Presumably, ARCO could have negotiated to tether the option price to a different benchmark, but chose not to do so. The option is not invalid simply because ARCO now stands to lose under the terms of its own bargain.[9]

¶ 49 More fundamentally, the 1983 option posed no practical restraint on ARCO's ability to improve or sell the property because ARCO reserved the express right to cancel the option at any time and for any reason. Unlike an ordinary option, which creates an absolute right to purchase property at the demand of the option holder, the 1983 option here was fully revocable by ARCO. Consequently, it did not prevent the improvement or conveyance of the property or otherwise violate the policies of the common law rule. In other words, because it could extinguish the option at any time at its sole discretion, ARCO retained full power to develop or dispose of the property.

¶ 50 Professor Gray, who articulated the classic formulation of the common law rule against perpetuities, long ago acknowledged that "[i]f the owner of the present interest in property is at liberty to destroy a future interest, that interest is not within the scope of the Rule Against Perpetuities." Gray, *supra,* at 510; *see also id.* at 512 ("an interest, which is presently destructible, is not subject to the Rule against Perpetuities"). This principle was articulated by the Maryland Court of Appeals in *Fitzpatrick v. Mercantile–Safe Deposit & Trust Co.:*

> So long as one person has an unrestricted present power to alienate absolutely and in fee simple for his own benefit no future interest can be void under the rule against perpetuities. For the policy of the rule to prevent the restriction of practical alienability is not violated.

220 Md. 534, 155 A.2d 702, 709–10 (1959) (quoting Lewis M. Simes & Frank A. Smith,

---

8. Equity was granted a right of first refusal if ARCO received an offer from another party to buy its interest in the Boies Block. The right of first refusal allowed Equity to purchase the property at the same price as offered by a third party. ARCO does not contend that this provision violates the rule against perpetuities.

9. To the extent that ARCO argues that the option price is insufficient or improper because Equity tendered an option price based on its own determination of a substitute for the benchmark price, that issue is not before this court.

*The Law of Future Interests* 232–33 (John A. Borron, Jr. ed., 3d ed. (2004))). In short, where a conveyor retains the absolute power to destroy a future interest through the power of revocation, the rule against perpetuities is not implicated. Restatement (First) of Property § 373 cmt. a. (1944).

¶ 51 For these reasons, the 1983 option did not violate the common law rule against perpetuities. Accordingly, we conclude that the reformation provision, section 15–11–1106(2), is inapplicable to the option. Section 15–11–1106(2) provides for reformation only if an interest was "created before May 31, 1991, and is determined in a judicial proceeding ... to violate this state's rule against perpetuities as that rule existed before May 31, 1991...." Although the 1983 option satisfies the first requirement for reformation (it was created prior to May 31, 1991), as discussed above, it does not violate the common law rule against perpetuities as that rule existed prior to May 31, 1991. Because the 1983 option was never subject to the rule against perpetuities, there was no need to reform it with a savings clause.

### III.

¶ 52 We hold that the 1983 option poses no practical restraint on alienation and does not violate the common law rule against perpetuities, and therefore is not subject to reformation under section 15–11–1106(2). Because the 1983 option is not subject to reformation under section 15–11–1106(2), we do not reach ARCO's arguments that section 15–11–1106(2) does not apply to commercial options, or that the lower courts' application of that section to the 1983 option was unconstitutionally retrospective. Accordingly, we affirm the judgment of the court of appeals on different grounds.