**131 Nev., Advance Opinion 13**

IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| BULLION MONARCH MINING, INC., Appellant, vs. BARRICK GOLDSTRIKE MINES, INC., Respondent. | No. 61059 FILED MAR 2 6 2015 TRACIE K. LINDEMAN CLERK OF SUPREME COURT BY_____ CHIEF DEPUTY CLERK |

Certified questions under NRAP 5 concerning whether the rule against perpetuities applies to an area-of-interest provision in a commercial mining agreement for the payment of royalties and, if so, whether reformation of the agreement is available under NRS 111.1039. United States Court of Appeals for the Ninth Circuit; Sidney R. Thomas, Chief Circuit Judge, M. Margaret McKeown and William A. Fletcher, Circuit Judges.

*Question answered.*

Lewis Roca Rothgerber LLP and Daniel F. Polsenberg and Joel D. Henriod, Las Vegas,
for Appellant.

Parsons, Behle & Latimer and Michael R. Kealy, Reno; Parsons, Behle & Latimer and Francis M. Wikstrom, Salt Lake City, Utah,
for Respondent.

Baker & Hostetler LLP and Mary P. Birk, Denver, Colorado,
for Amicus Curiae Mary Ann Schmidt.

_____

BEFORE THE COURT EN BANC.

7/21/15: Corrected per letter to publishers. CJ

15 - 09137

*OPINION*

By the Court, CHERRY, J.:

The Ninth Circuit Court of Appeals certified two questions to this court concerning Nevada's rule against perpetuities. The first question asks whether Nevada's "Rule Against Perpetuities appl[ies] to an area-of-interest provision in a commercial mining agreement." The second asks whether, if the rule applies, courts may reform such agreements under NRS 111.1039(2). We accepted the certified questions and directed briefing.

We conclude that Nevada's common-law rule against perpetuities does not extend to area-of-interest royalties created by commercial mining agreements. Courts developed the rule to promote public policy by ensuring that property remained alienable. Applying the rule to area-of-interest royalty agreements does not further public policy. Our Legislature has said as much by exempting commercial, nondonative transfers from the statutory rule against perpetuities. Even though the statutory rule was not in effect when this agreement was made, we see no reason to disagree with the Legislature in our own policy analysis. Because we answer the first question negatively, we do not need to consider the second.

*FACTS AND PROCEDURAL HISTORY*

"This court's review is limited to the facts provided by the certification order . . . ." *In re Fontainebleau Las Vegas Holdings*, 128 Nev. ___, ___, 289 P.3d 1199, 1207 (2012). Those facts are as follows.

Bullion Monarch Mining, Inc. (Bullion), alleges that Barrick Goldstrike Mines, Inc. (Barrick), owes royalty payments to Bullion under an area-of-interest provision in a 1979 agreement. According to Bullion,

its predecessor-in-interest entered into the agreement with a mine operator, Barrick's predecessor-in-interest, to develop Bullion's predecessor's mining claims in the Carlin Trend.

The area-of-interest provision requires the mine operator to pay Bullion a royalty on production resulting from the operator's mining claims that the operator might subsequently acquire within the area of interest. Under the agreement, Bullion is to receive royalty payments on production from after-acquired claims in the area of interest for 99 years.

Bullion filed suit in Nevada federal district court seeking royalty payments on production from after-acquired claims in the area of interest. Barrick argued that it did not owe royalties because the area-of-interest provision is void under the rule against perpetuities. Bullion responded that the rule does not apply to area-of-interest royalty agreements. In the alternative, Bullion sought reformation of the agreement under NRS 111.1039(2).

The federal district court granted summary judgment to Barrick based on the rule against perpetuities. Bullion appealed. The Ninth Circuit Court of Appeals then certified these questions to this court.

## DISCUSSION

"The common-law rule [against perpetuities] is usually stated thus: No interest is good unless it must vest, if at all, not later than twenty-one years after some life in being at the creation of the interest." *Sarrazin v. First Nat'l Bank of Nev.*, 60 Nev. 414, 418, 111 P.2d 49, 51 (1941) (internal quotation omitted). In Nevada, the rule is codified in our Constitution: "No perpetuities shall be allowed except for eleemosynary purposes." Nev. Const. art. 15, § 4. But in 1987, Nevada adopted a statutory rule against perpetuities. *See* NRS 111.1031; 1987 Nev. Stat.,

ch. 25, §§ 2-8, at 62-65. The new statutes added a wait-and-see provision, which, as amended, gives contingent property interests 365 years to vest before they are invalidated. *See* NRS 111.1031(1)(b). The statutory scheme exempts nondonative transfers from the rule against perpetuities. NRS 111.1037(1). It also lets courts reform agreements made before its enactment to bring them into conformity with the rule. NRS 111.1035. Nevada's statute was not in effect at the time of the agreement at issue in this case.

We are thus confronted with the question of whether Nevada's common-law rule against perpetuities, as codified by the Nevada Constitution, applies to commercial mining agreements for the payment of area-of-interest royalties. We hold that it does not.

Barrick argues that the perpetuities provision in the Nevada Constitution confines our analysis of the rule. It argues that we ought to apply the rule as it existed when the Constitution was adopted. It then asserts that, because commercial agreements may have been subject to the rule in 1864, all commercial agreements are still subject to the common-law rule. We disagree.

As a creature of the common law, the rule against perpetuities is not static. Our Constitution may have adopted the common-law rule, but it did not freeze the rule's application. *See* Jack M. Balkin, *Original Meaning and Constitutional Redemption*, 24 Const. Comment. 427, 433 (2007). The meanings of the Constitution's words remain constant, but their application may vary with the circumstances of time and place. *See generally* Lawrence B. Solum, *The Interpretation-Construction Distinction*, 27 Const. Comment. 95-118 (2010) (distinguishing between discovery of textual meaning and application of text to case at bar). For example,

when interpreting the Second Amendment, the United States Supreme Court reasoned that "arms" was not limited to weapons in existence at our nation's founding:

> Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment. We do not interpret constitutional rights that way. Just as the First Amendment protects modern forms of communications, *e. g.*, *Reno v. American Civil Liberties Union*, 521 U. S. 844, 849 (1997), and the Fourth Amendment applies to modern forms of search, *e. g.*, *Kyllo v. United States*, 533 U. S. 27, 35–36 (2001), the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.

*District of Columbia v. Heller*, 554 U.S. 570, 582 (2008).

We confronted a similar issue in *Rupert v. Stienne*, 90 Nev. 397, 528 P.2d 1013 (1974). There, this court considered NRS 1.030, which states that "'[t]he common law of England, so far as it is not . . . in conflict with [Nevada or federal law] shall be the rule of decision in all courts of this State.'" *Id.* at 399, 528 P.2d at 1014 (quoting NRS 1.030). In spite of this statute, this court refused to apply the old common-law rule of interspousal immunity. *Id.* at 404, 528 P.2d at 1017. This court noted that "[h]aving been created and preserved by the courts, the doctrine is subject to amendment, modification and abrogation by the courts if current conditions so dictate." *Id.* at 399, 528 P.2d at 1014. The court concluded that "we believe that the time has arrived to abrogate the doctrine [of interspousal immunity]." *Id.* at 403, 528 P.2d at 1017. The common law, though adopted in broad form by statute, continued to evolve as new circumstances required new application.

Likewise, in our case, the word "perpetuities" in the Nevada Constitution applies to precisely that: perpetuities. But we must for the first time decide whether an area-of-interest royalty is indeed an unenforceable perpetuity under the common law of Nevada. This inquiry into the common law is informed by both precedent and policy.

Nineteenth century legal dictionaries define perpetuities in reference to donative transfers, not commercial ones. An 1888 legal dictionary provides an example of a trust income that, upon the death of the beneficiary, is conferred upon his son, and after the son's death to his son, and so on:

> Perpetuity properly signifies a disposition of property by which its absolute vesting is postponed forever; as, for instance, if property were conveyed to trustees upon trust to pay the income of A. for life, and after his death to his eldest son for life, and after *his* death to *his* eldest son, and so on. Such dispositions are contrary to the policy of the law, because they "tie up" property and prevent its free alienation.

2 Stewart Rapalje and Robert L. Lawrence, *A Dictionary of American and English Law* 953 (Jersey City, N.J., Frederick D. Linn & Co., 1888), *available at* http://goo.gl/yiEmzA. An 1850 legal dictionary defines perpetuity as "[t]he condition of an estate being rendered *perpetually* . . . unalienable by the act of the proprietors." Henry James Holthouse, *A New Law Dictionary* 302 (Boston, Charles C. Little and James Brown, 2d ed. 1850), *available at* http://goo.gl/ABNUp5. These definitions do not appear to contemplate a business agreement that might outlive the real persons executing it, but won't outlive the business entities that own the interest. And because royalty interests can be exchanged, bought, or sold, there is no obvious restraint on alienation.

Indeed, Barrick and Bullion were not the original parties to the agreement; they acquired those interests. This shows that alienation is not restricted in the traditional sense, where property is tied up with descendants through the dead-hand power of century-ago settlors. So it is not obvious from the definition of "perpetuity" that it encompasses commercial mining interests.

While the traditional articulation of the rule against perpetuities does not distinguish between commercial and donative transfers, *see Sarrazin*, 60 Nev. at 418, 111 P.2d at 51 (stating common-law rule without distinguishing between commercial and donative transfers), the modern trend is to not apply the rule rigidly or mechanistically. 70 C.J.S. *Perpetuities* § 10 (2014). Many courts refuse to apply the rule where its purposes will not be served. *Id.* The rule developed "to curb excessive dead-hand control of property retained in families through intergenerational transfers." Restatement (Third) of Prop.: Servitudes § 3.3 cmt. b (2000). Thus, courts have held that certain commercial agreements are not subject to the common-law rule against perpetuities because to hold otherwise would contravene public policy. *See Atl. Richfield Co. v. Whiting Oil & Gas Corp.*, 320 P.3d 1179, 1184 (Colo. 2014) ("[W]e have avoided applying the rule against perpetuities to certain types of interests in commercial settings where we have concluded that the purposes of the common law rule would not be advanced.").[1]

---

[1]*See also Weber v. Texas Co.*, 83 F.2d 807, 808 (5th Cir. 1936) ("The [oil lease] option under consideration is within neither the purpose of nor the reason for the rule. . . . [The option] does not restrain free alienation by the lessor. He may sell at any time . . . . The option is therefore not objectionable as a perpetuity."); *Bauermeister v. Waste Mgmt. Co. of Neb.*,

*continued on next page . . .*

For example, in *Juliano & Sons Enterprises, Inc. v. Chevron, U.S.A., Inc.*, 593 A.2d 814, 818-19 (N.J. Super. Ct. App. Div. 1991), a New Jersey appellate court decided that the rule against perpetuities does not apply to commercial transactions. *Juliano* is similar to this case because the transaction at issue took place before the enactment of New Jersey's statutory rule. *Id.* at 815, 817. Even though the statutory rule was not in effect at the time of the transaction, the court applied it anyway in order "to effectuate the current policy declared by the legislative body." *See id.* at 819. The court noted that "[t]he fact that nondonative commercial transactions are excluded from the Act is not dispositive" of the issue. *Id.*

---

*. . . continued*

783 N.W.2d 594, 600 (Neb. 2010) ("There are sound public policy reasons which support the conclusion that contractual options to repurchase, such as the one at issue in this case, are not subject to the rule against perpetuities."); *Metro. Transp. Auth. v. Bruken Realty Corp.*, 492 N.E.2d 379, 385 (N.Y. 1986) ("[W]e hold that the rule against remote vesting does not apply to preemptive rights in commercial and governmental transactions . . . ."); *Rich, Rich & Nance v. Carolina Const. Corp.*, 558 S.E.2d 77, 80 (N.C. 2002) ("[O]ur common law rule against perpetuities does not exclude commercial interests from its application. . . . [However, c]ommercial transactions that do not violate the underlying policies behind the rule against perpetuities . . . do not fit under the umbrella of the common law rule."); *Producers Oil Co. v. Gore*, 610 P.2d 772, 774 (Okla. 1980) (agreeing with federal district court that the rule against perpetuities "should not apply and no worthwhile social or economic purpose is served by applying it to this common, frequent and useful type of oil and gas transaction. The provision in question does not clog alienation." (citation omitted)); *Robroy Land Co., Inc. v. Prather*, 622 P.2d 367, 371-72 (Wash. 1980) ("By so holding, we believe we more nearly meet the needs of a commercial society than by strictly enforcing the rule against perpetuities as it has come to us from the common law.").

at 818. The court acknowledged that the "Legislature, as the authoritative source of public policy, has now decided the types of transactions which should be subject to the rule against perpetuities and which should not." *Id.* at 819. The court reasoned that "[n]either the Legislature nor this court can perceive any danger to titles or alienability of real properties requiring continued application of the rule to nondonative commercial transactions even where they occurred prior to the effective date of the Act." *Id.* The court concluded that "the nondonative commercial transaction . . . is no longer subject to the common-law rule against perpetuities." *Id.* at 815.

The Colorado Supreme Court very recently refused to apply the rule against perpetuities to a 25-year option to repurchase a shale oil property. *Atl. Richfield Co.*, 320 P.3d at 1181. The court said that "we will apply the rule against perpetuities only where the purposes of the rule are served." *Id.* at 1187 (quotation omitted). "Looking to whether the purposes of the common law rule are served," the court reasoned "that the . . . option did not discourage valuable improvements to the land" because each party possessed sufficient incentives to improve or invest in the land. *Id.* at 1190. Accordingly, the court held that the common-law rule against perpetuities did not apply. *See id.* at 1181.

An area-of-interest royalty agreement is an agreement whereby one party agrees to pay a portion of not-yet-acquired mineral interest's output to the other party because that mineral interest lies within an area of interest. The provision may exist, for example, in an agreement for the sale of a mineral interest. The mineral interest's current owner is often "of the opinion that it is as a result of his efforts that the [interest buyer] is in the 'area' and that he should participate in

any proceeds derived from that locale." Larry D. Clark, *Area of Interest Provisions*, 12C Rocky Mtn. Min. L. Inst. 6, 6-1 (1981). It is often unclear how far a mineral vein will run. The owner of the interest wishes to receive, in a sense, a finder's fee in the form of a royalty, in case the mine operator discovers that the vein runs farther than the location of the conveyed mineral interest. *See* Mark T. Nesbitt, *Area of Interest Provisions—Two-Edged Swords*, 35 Rocky Mtn. Min. L. Inst. 21, § 21.02 (1989).

We are persuaded that public policy weighs against applying the rule against perpetuities to area-of-interest royalty agreements. Because such provisions compensate explorers, applying the rule this way appears efficient. And because the agreement is a commercial one, there is no human decedent exercising dead-hand control over still-living descendants. *Cf. Atl. Richfield*, 320 P.3d at 1184 ("[T]he vesting period of the common law rule, based on lives in being plus twenty-one years, makes little sense in the world of commercial transactions."). Further, as noted above, even if the interest remains on the land, nothing appears to prohibit alienation of the interest. Bullion and Barrick are both successors in interest, not by birth, but by commercial exchange. This is not the kind of "entailed estate[ ]" that the rule against perpetuities was intended to prevent. *Debates & Proceedings of the Nevada State Constitutional Convention of 1864*, at 741 (Andrew J. Marsh off. rep. 1866); *see* Restatement (Third) of Prop.: Servitudes § 3.3 cmt. b (2000). Our Legislature has determined that, as a matter of policy, nondonative

SUPREME COURT
OF
NEVADA

(O) 1947A

10

transfers should not be subject to the rule against perpetuities. *See* NRS 111.1037. We see no reason to disagree with this policy in our application of the rule. *Cf. Juliano*, 593 A.2d at 819 ("Neither the Legislature nor this court can perceive any danger . . . requiring continued application of the rule to nondonative commercial transactions even where they occurred prior to the effective date of the Act.").

Therefore, in response to the first certified question, we answer that the rule of perpetuities does not apply to area-of-interest royalty provisions in commercial mining contracts. Because the rule does not apply, there is no need to address the second certified question.

_____, J.
Cherry

We concur:

_____, C.J.
Hardesty

_____, J.
Douglas

_____, J.
Gibbons

_____, J.
Parraguirre

_____, J.
Saitta

_____, J.
Pickering